305 Ga. 513
FINAL COPY

S19A0430.  BLAINE v. THE STATE.

MELTON, Chief Justice.

Michael Blaine was tried on a 38-count indictment and convicted of numerous offenses, including murder, in connection with a string of robberies that took place between October 2005 and September 2006.[1] Blaine appeals,

---

[1] On June 15, 2010, a DeKalb County grand jury charged Blaine, along with a group of other individuals, with: violation of Georgia's RICO Act (Count 1); malice murder (Counts 3 and 32); felony murder (Counts 4, 5, 6, 33, 34, and 35); armed robbery (Counts 2, 11, 12, and 22); aggravated assault (Counts 7, 8, 13, 14, 23, and 36); aggravated assault of a law enforcement officer (Counts 29 and 30); kidnapping with bodily injury (Counts 15, 16, and 24); false imprisonment (Count 25); burglary (Counts 17, 18, 19, 20, 26, 27, and 28); conspiracy to violate the Georgia Controlled Substances Act (Count 9); criminal attempt to commit a violation of the Georgia Controlled Substances Act (Count 37); and possession of a firearm by a convicted felon (Counts 10, 21, 31, and 38).

Blaine was tried alone from April 30-May16, 2012.  The jury acquitted him of two counts of aggravated assault (Counts 30 and 36), one count of malice murder (Count 32), three counts of felony murder (Counts 33, 34, and 35), and one count of criminal attempt to violate the Georgia Controlled Substances Act (Count 37); the jury found Blaine guilty of all other charges (Counts 1-29, 31, and 38).  The trial court sentenced Blaine to a total of eight consecutive terms of life without the possibility of parole (armed robbery — Counts 2, 11, 12, and 22; malice murder — Count 3; and kidnapping with bodily injury — Counts 15, 16, and 24), with an additional 160 years to serve in confinement (twenty years for RICO — Count 1; ten

arguing that the prosecutor made improper statements during closing arguments, that he was denied his rights to due process and access to the courts, and that he was denied effective assistance of counsel. Finding no error, we affirm.

Viewed in the light most favorable to the jury's verdict, the evidence presented at trial established that, at all relevant times, Blaine, a convicted felon, led a group of people around DeKalb County with the purpose of robbing drug dealers and others. Tori Moore, Jamal Callaway, Quazzard James, Berry Welborn, Johnny Travitt, Walter Landers, Cara Johnson, Curtis Frezzell, and Darren Batteast were some of the individuals involved in this group; however,

---

years for conspiracy — Count 9; five years each on the weapons charges — Counts 10, 21, 31, and 38; twenty years for each of the burglary charges — Counts 17, 19, and 26; twenty years for each aggravated assault — Counts 23 and 29; and ten years for false imprisonment — Count 25). The trial court merged the remaining charges for sentencing purposes. Although the trial court purported to "merge" the felony murder counts into malice murder for sentencing purposes, the felony murder counts were actually vacated by operation of law. See Malcolm v. State, 263 Ga. 369 (4) (434 SE2d 479) (1993).

Blaine filed a motion for new trial on May 17, 2012, which he amended through new counsel on July 24, 2018. After a hearing, the trial court denied the motion as amended on September 21, 2018. Blaine filed a timely notice of appeal on October 1, 2018. His appeal was docketed to the term of this Court beginning in December 2018 and submitted for a decision on the briefs.

not all participated in every robbery.[2] Blaine would choose the targets of, and devise the plans for, every robbery, and then the group would execute his directions. After each robbery was completed, the group would split up whatever proceeds and items were taken.

Armed Robbery of Terrell Crook (Counts 1 and 2)

On October 12, 2005, Crook was selling drugs out of a motel room at a Super 8 off of Panola Road in DeKalb County. Blaine chose Crook to be the target of a robbery and enlisted Landers and Moore for help. Moore was to act as the lure/getaway driver, and Landers was to assist with the robbery. That evening, Crook ran into Moore and invited her into his room for a conversation. The two spoke for a few minutes, after which Moore indicated that she needed to leave. Thereafter, Blaine and Landers kicked in the door; Blaine held a gun to Crook's face and said, "you already know what it is." As Crook lay on the floor, Blaine hit him in the back of the head with the gun. The men then raided Crook's motel room, taking his clothes, drugs, money, a gun, and a PlayStation video game unit.

---

[2] Moore, Landers, Johnson, Callaway, Frezzell, and Batteast all testified against Blaine at his trial.

## Murder of Eric Banks (Counts 1, 3-10)

On November 17, 2005, Blaine called Landers about robbing someone at Pinewood Apartments in DeKalb County. When Landers declined to participate, Blaine recruited James and Welborn. Moore drove Blaine, James, and Welborn to the back of the apartment complex and dropped them off so the men could commit the robbery. Blaine was carrying a .380 caliber gun, and James carried a Makarov 9 mm.

The men went to the apartment of Banks, a known drug dealer; Welborn approached the front door while Blaine and James hid nearby. Banks, who was also armed, greeted Welborn at the door and then led him into the kitchen where the two got into an argument over money. The men walked back to the front door and, as soon as Banks walked outside, Blaine and James drew their weapons and started shooting. Banks' roommate, who was home during the confrontation, ran outside; he found Banks on the ground covered in blood and saw the shooters running from the scene. Blaine shot toward the roommate as he fled, after which the roommate grabbed his 9 mm Ruger and returned fire. Blaine, James, and Welborn jumped into Moore's car, and the group drove off. During the drive, Blaine told Moore that "he left a ni\*\*er leaking."

Officers responded to the scene and found Banks lying on the ground, unresponsive; they recovered two Ruger 9 mm cartridge casings, seven Makarov 9 mm cartridge casings, one CBD .380 cartridge casing, and one MRP .380 cartridge casing near Banks' body. Banks' .45 caliber weapon was on the ground near his body. Officers also located cocaine inside the home packaged in individual small baggies. An autopsy revealed that Banks had suffered four gunshot wounds: one to the face, one to the right shoulder, one to the left chest, and one to the left abdomen. The gunshot wound to the chest, which was the wound that caused Banks' death, left soot on his clothing, suggesting he was shot at close range.

Blaine called Landers later that evening and told him that the robbery "didn't go good," that "people got shot, and he thinks the person is dead, and [Landers] need[ed] to stay away from those apartments for a while." Blaine admitted to Landers that he and James shot Banks, but only after the victim refused to put his own weapon down.

Armed Robbery of Dhanajay and Bandana Gupta (Counts 1, 11-21)

On December 14, 2005, Moore dropped Blaine, Landers, and Callaway off at Towering Pines Apartments in DeKalb County so the men could conduct

another robbery. The men put on masks, hid under some stairs, and waited for the Guptas, the married residents, to return. As soon as the Guptas arrived, Blaine, Landers, and Callaway forced their way inside the apartment. They tied the Guptas' hands together, held them at gunpoint, hit them both over the heads with guns, demanded money, and ransacked the apartment. At some point, the men separated the Guptas and continued to hit them. They also threatened to shoot them and hurt them with knives they had warmed over the stove in the Guptas' kitchen.

After the men took some jewelry and money from the home, they demanded the Guptas take them to the Citgo gas station down the street, which the couple owned. The men directed the Guptas to get into their own van at gunpoint; Blaine got into the driver's seat and drove everyone to the gas station. Once there, Mr. Gupta activated the silent alarm, and then opened the safe in the back of the store. Blaine and Callaway took money from the safe and ransacked the store.[3] Moore picked up the men and the victims at the gas station and drove everyone to an abandoned house where the group continued

---

[3] Surveillance video from the store corroborated witness testimony regarding this incident.

to beat the Guptas and threaten their lives. After some time, the Guptas lay still and pretended to be unconscious.  The group then left the victims at the house and fled the scene.

The Guptas were able to escape and return to the Citgo where they met the police, who had responded to the silent alarm. Mr. Gupta was taken to the hospital where he received 16 stitches for an injury to the back of his head.

### Armed Robbery of John Rowan (Count 1)

On April 26, 2006, Blaine picked a house in Lithonia, DeKalb County, to burglarize. The house was targeted because he believed that drugs and money were inside. Blaine recruited Landers for the robbery, and another robbing crew, known as "The Firestarters," joined the enterprise. The men pulled up to the house, adorned masks, and kicked in the back door. They woke up Rowan at gunpoint, led him to a sofa located on the first floor of the house, and started searching for money and drugs. They immediately located a shoebox filled with money, but nothing else. They then began beating Rowan with a crowbar and their guns, demanding he tell the group where the remainder of the money was. Rowan resisted until they shot him in the leg, then he finally complied; the group took the rest of the money, totaling about

$50,000, and then dragged Rowan out to his garage where they tied him up. A couple of the men from the Firestarters got into Rowan's Corvette, which was stored in the garage, and drove off. Landers fled on Rowan's ATV, and the rest of the group got into their respective cars and drove off.

Law enforcement responded to the home and found Rowan beaten and bloodied. The doorframe to the back door of the house was broken, and a roll of duct tape was located in the driveway near the garage. One shell casing was located next to the couch where Rowan was initially held, and the couch itself had a bullet hole in it. Officers also located a crowbar at the home, and Rowan's ATV was found down the street.

<u>Armed Robbery of Timothy and Lamonica Johnson and Aggravated Assault of DeKalb County Police Officers (Counts 1, 22-31)</u>

On July 10, 2006, Blaine recruited Curtis Frezzell, Darren Batteast, and Johnny Travitt to break into the Johnson residence on Navarre Drive in Stone Mountain, DeKalb County.[4] Timothy Johnson, a former drug dealer, was standing in the carport of his home when he saw four men hiding behind his truck. Blaine and Travitt were both armed with .40 caliber Glocks, and

_____

[4] Cara Johnson, no relation to the victims, was also recruited as the getaway driver.

Batteast carried an AK47. By the time that Blaine, Travitt, Frezzell, and Batteast arrived, Mr. Johnson's wife and four children were inside getting ready for bed.

Upon spotting the men, Johnson ran back toward the house, locked the door behind him, and motioned for his two older children to hide in the bathroom.  The men pursued Johnson inside, held him at gunpoint, threatened his family, and hit him in the head with a handgun numerous times, all while demanding large sums of money. The men entered Johnson's bedroom where his wife and his two youngest children were hiding; after they brandished their weapons and made another demand for money, Mrs. Johnson gave the men her purse and the pin number for her bank card. Batteast held Mrs. Johnson and the children at gunpoint in the bedroom and would not allow them to leave. Eventually, Mr. Johnson led the men upstairs to the attic where he kept approximately $700. The men took that money, then led Johnson back downstairs where they bound him with duct tape, pushed him to the floor, and threatened to shoot him.

The police, who had been called by the Johnsons' oldest child, arrived at the house. As Blaine, Batteast, and Travitt fled from the scene, one of them

shot at Officer A.R. Williams from the DeKalb Police Department, and the officer returned fire. Frezzell, meanwhile, hid in a bedroom closet where he was eventually located and arrested. During their initial sweep of the scene, officers found four 9 mm shell casings in the front yard, which were identified as coming from Officer Williams's weapon, and an additional four .40 caliber shell casings in the street.

While officers were still at the residence, Cara Johnson received a call from Batteast and Blaine asking for a ride. She picked the men up in a wooded area near the scene of the crime, and, as she drove out of the neighborhood, the police activated their emergency lights and sirens and gave chase; Batteast and Blaine yelled for Cara to keep driving. At one point, Blaine directed her to stop the car. He then jumped out, shot at Officer Adrian Carney, who was pursuing the fleeing vehicle, and then ran off. Batteast and Cara remained in the car and were subsequently arrested. While searching the scene where the car stopped, officers located a single .40 caliber shell casing and a black tennis shoe. The shoe was swabbed and tested for DNA; the results returned a mixture of DNA from multiple individuals, including Blaine.

That night, Moore received a call from Blaine asking for a ride. She found him on the side of the road in Stone Mountain; he was dressed in all black and was missing a shoe. He did not tell her what had occurred that night. However, Blaine later told Landers "that the lick went bad and somebody had got locked up."

<u>Murder of Yucef Ellis (Counts 1, 32-38)</u>

On September 23, 2006, Yucef Ellis met Blaine at Tara Carnes' house in Lithonia, DeKalb County, to conduct a drug transaction. Ellis walked into the home and slid a duffle bag toward Blaine; the bag was filled with clothing. When Blaine asked what was going on, Ellis brandished a gun from his waistband and demanded Blaine get on the floor. At some point, Blaine also pulled out a gun, and the two began shooting. Blaine fled from the scene; witnesses found Ellis inside the house with a gunshot wound to his chest. This wound was subsequently determined to be the cause of his death. Blaine later told Landers that the shooting was a drug deal gone wrong, "that he had got shot, and that he had killed the man that shot him."

1. Though not enumerated as error by Blaine, we find that the evidence as summarized above was sufficient to enable a rational trier of fact

to conclude beyond a reasonable doubt that Blaine was guilty of the crimes for which he was convicted. See <u>Jackson v. Virginia</u>, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2.    During closing argument, defense counsel attacked the State's case by focusing on the prosecution's failure to call multiple witnesses during its presentation of the evidence and by arguing that the witnesses who were called were not truthful. In response, the State rebutted the defense's numerous arguments, eventually stating:

> If [Blaine] wasn't — and I stress this again, he has no burden of proof whatsoever.  But if [Blaine] was somewhere else that night, you would have heard that, too, and you didn't. . . . The burden is on the State, not the defense.  They never have to present a thing.  And I say this again: if [Blaine] was somewhere else that night, you would have heard it.

Defense counsel objected, arguing that the prosecutor impermissibly commented on Blaine's right to remain silent and improperly shifted the burden onto the defense. The trial court overruled the objection. Blaine contends that this ruling was erroneous and further contends that the trial court should have, sua sponte, given a curative instruction pursuant to OCGA § 17-8-75.  We disagree.

It is well settled that "a prosecutor is granted wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion." Scott v. State, 290 Ga. 883, 885 (725 SE2d 305) (2012). What is more, "[c]losing arguments are judged in the context in which they are made." (Citation omitted.) Adams v. State, 283 Ga. 298, 302 (658 SE2d 627) (2008). Indeed,

> [a] prosecutor may not comment on the failure of a defendant to testify, but he may "argue that evidence showing guilt has not been rebutted or contradicted[.]" Moreover, a prosecutor "[is] entitled to emphasize the evidence favorable to [the State], to discuss and draw inferences from factual matters in evidence relating to the credibility of witnesses, and to respond to points made in — and issues omitted from — the defendant's closing argument."

(Citations omitted.) Ingram v. State, 253 Ga. 622, 634 (323 SE2d 801) (1984). Reading closing arguments as a whole, the State was addressing the defense's failure to rebut, by any evidence, the State's evidence that the defendant participated in the crimes, and was not improperly commenting on Blaine's decision not to testify or shifting the burden of proof to the defense. See, e.g., Thornton v. State, 264 Ga. 563 (4) (a) (449 SE2d 98) (1994). Moreover, because the State's closing argument was proper, a sua sponte curative instruction by the trial court would have been unwarranted.

3.     Blaine next contends that he was denied his rights to due process and access to the courts when he was allegedly denied access to his legal papers and other legal resources on the eve of trial. "Meaningful access [to the courts] means that state authorities must ensure that inmates have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." (Citations and punctuation omitted.) Gibson v. Turpin, 270 Ga. 855, 858 (513 SE2d 186) (1999). This "'requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.'" Daker v. Humphrey, 294 Ga. 504, 505 (755 SE2d 201) (2014) (quoting Bounds v. Smith, 430 U. S. 817, 828 (97 SCt 1491, 52 LE2d 72) (1977)). "Any restriction on a prisoner's access to the courts must be 'clearly warranted by the particular circumstances of each case.'" (Citation omitted.) Daker, 294 Ga. at 505. Applying these legal principles to the facts of this case, we conclude that Blaine was given meaningful access to the courts and suffered no deprivation of due process.

The record shows that, on the first day of trial, defense counsel filed a "Motion to Enjoin the State from Violating [Blaine's] Rights," wherein he

claimed that Blaine's constitutional rights had been violated after he was "placed in 'the hole' at the DeKalb County Jail [the week prior to trial] without any notice or due process," and without "access to his attorneys, legal papers, hygiene products, etc." At a pre-trial hearing, the State informed the trial court that the Sheriff's office placed Blaine in solitary confinement prior to trial because he was considered a security risk to the State's witnesses. After hearing arguments from the parties, the trial court found no constitutional violations had occurred, yet ordered that all law enforcement agencies housing Blaine ensure that he had reasonable access to his attorneys, legal papers, notes, personal grooming products, and food. Over the course of the next few days, Blaine continued to claim, without any evidentiary support, that he was being denied access to his legal papers, and further asserted that some of his papers had gone missing. Notably, when the trial court asked Blaine what papers he still needed, Blaine did not respond and stopped contesting the issue.

At the hearing on Blaine's motion for new trial, the State presented evidence that, as an inmate held in solitary confinement at the DeKalb County jail, Blaine could still send and receive letters, retain his legal papers and books, and have access to his attorney. At the same hearing, defense counsel

testified that: he reviewed the State's discovery with Blaine prior to trial; Blaine was able to look at counsel's trial file whenever he wanted; counsel gave Blaine copies of all documents and Blaine was familiar with the case and the discovery; to the extent Blaine was denied access to his legal documents, it was for a very short period of time in relation to the length of time the case had been pending; counsel could not recall a time where he was denied access to his client; and that he filed the pre-trial motion based solely upon what Blaine had told him and not based upon any independent confirmation or corroboration of Blaine's claims.

The record shows that, despite being placed in solitary confinement prior to trial, Blaine was given numerous opportunities to have his claims filed in, heard by, and ruled upon by the trial court. Moreover, as found by the motion for new trial, Blaine failed to substantiate his claims with any credible testimony or evidence. See, e.g., Gibson, supra, 270 Ga. at 858 ("Meaningful access does not mean that a state must help inmates *discover* grievances. . . .It is simply the right of an inmate to raise his claims and be heard.") (citation omitted; emphasis supplied). Accordingly, he cannot show that he was denied access to the courts or denied the right to due process.

4.     Finally, Blaine contends that his trial counsel was ineffective when he failed to request a continuance or move for a mistrial after Blaine's rights to due process and access to the courts were violated based on being denied access to legal papers and legal resources. However, for the reasons discussed in Division 3, supra, Blaine has failed to show either deficient performance or prejudice pursuant to Strickland v. Washington, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). Indeed, the trial court could have operated well within its discretion to deny a continuance or a motion for mistrial where neither a continuance nor a mistrial was warranted under the circumstances presented here, and trial counsel cannot be ineffective for failing to raise claims that would not have succeeded nor made any difference in the outcome of Blaine's case. See Wesley v. State, 286 Ga. 355 (3) (b) (689 SE2d 280) (2010) (trial counsel cannot be ineffective for failing to make a meritless objection). Accordingly, his claim fails.

Judgment affirmed.  All the Justices concur.

Decided March 11, 2019.

Murder. DeKalb Superior Court. Before Judge Seeliger.

Y'Chili Law, Kalki Yalamanchili, for appellant.

Sherry Boston, District Attorney, Lenny I. Krick, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton. Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vanessa T. Sassano, Assistant Attorney General, for appellee.