316 Ga. 827
FINAL COPY

S23A0135.  LEONARD v. THE STATE.

BETHEL, Justice.

Following a jury trial, Appellant Joshua Leonard was convicted of malice murder and related crimes arising from the August 2010 shooting of Calvin Grimes, which resulted in Grimes's death approximately ten months later from complications related to gunshot wounds.[1] On appeal, Leonard argues that the trial court

---

[1] In January 2014, a Muscogee County grand jury indicted Leonard and co-defendant Jarvis Alexander for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), two counts of aggravated assault (Counts 3 and 4), aggravated battery (Count 5), and possession of a firearm during the commission of a felony (Count 6). Leonard was charged individually with possession of marijuana with intent to distribute (Count 7). Leonard and Alexander were tried jointly before a jury from October 27 to November 3, 2014. Leonard was found guilty of all counts. Alexander was found guilty of the counts with which he was charged, but his case is not part of this appeal.

The trial court sentenced Leonard to serve life in prison for malice murder (Count 1), five years in prison consecutive for possession of a firearm during the commission of a felony (Count 6), and ten years in prison concurrent for possession of marijuana with intent to distribute (Count 7). The trial court purported to merge the felony murder count into Count 1, but the felony murder count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). The trial court also merged the aggravated assault counts and the aggravated battery count.

Leonard filed a timely motion for new trial on November 20, 2014, which

erred in five respects and that he was prejudiced by the cumulative effect of those errors. As discussed below, Leonard's claims fail, so we affirm.

1. Viewed in the light most favorable to the verdicts, see *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979), the evidence adduced at trial showed as follows. Around 10:00 p.m. on August 19, 2010, Columbus Police Department officers were dispatched to the parking lot of an apartment complex on a report of gunshots. Upon arrival, the officers observed a parked vehicle with its engine running; Grimes, who was bleeding profusely, was in the driver's seat making "gurgling" noises but did not speak. Grimes was transported to a hospital with multiple gunshot wounds.

Officers recovered 11 spent shell casings around Grimes's vehicle; the casings were of two calibers — .22-caliber and .40-

he amended through new counsel on January 28, 2020. After a hearing, the trial court denied Leonard's motion for new trial as amended. Leonard filed a timely notice of appeal, and his appeal was docketed in this Court to the term beginning in December 2022 and submitted for a decision on the briefs.

caliber. Bullet holes indicated that shots were fired from outside the vehicle, and based on the locations where the shell casings were found, it appeared that a shooter exited the vehicle while rapidly firing shots. Officers were unable to locate any witnesses.

As a result of a gunshot wound to his neck, Grimes "sustained a very high spinal cord injury," rendering him a quadriplegic, and he required a ventilator to breathe, among other life-sustaining treatments. After the shooting, Grimes was sedated for several weeks, regaining consciousness in early October. Though Grimes remained dependent upon a ventilator, he ultimately regained the ability to speak after a valve was installed in his trachea.

After regaining consciousness in October 2010 and on several occasions preceding his death, Grimes communicated to family members, friends, and an investigating detective that Leonard and Alexander were responsible for shooting him. As discussed in Division 2 below, the trial court admitted testimony at trial regarding these statements as dying declarations. Grimes's girlfriend testified that the first thing Grimes communicated to her

upon waking was that "Doo-Doo" and "Josh" shot him. Grimes's girlfriend was familiar with both men, and, at trial, she identified Alexander as Doo-Doo and Leonard as Josh. According to Grimes's mother and girlfriend, Grimes and Alexander were good friends.

On October 11, days after Grimes regained consciousness, Detective Wayne Fairbairn visited him in the hospital. According to Fairbairn, Grimes, who remained on the ventilator, "couldn't talk" and "could only mouth words,"[2] but he "could suck his cheek and make a clicking noise." When asked if he knew who shot him, Grimes responded affirmatively. Fairbairn then devised a means by which Grimes could spell out the name of the shooter; Fairbairn wrote the alphabet on a piece of paper[3] then pointed to each letter in turn, and Grimes made "the clicking noise" to spell out the shooter's name. Through that process, Grimes spelled out the first and last names of two shooters: Leonard and Alexander. Grimes was able to communicate the shooters' race and age, as well as the fact that they

---

[2] This interview preceded the introduction of the valve to the tracheotomy tube which allowed Grimes to speak.

[3] The piece of paper was introduced as an exhibit at trial.

were from Phenix City, Alabama. Fairbairn located mugshots of Leonard and Alexander and created two six-photograph arrays. Two days later, Fairbairn returned to the hospital to show the arrays to Grimes. Grimes identified Leonard's photograph in the first array and Alexander's photograph in the second array and indicated that they were responsible for his injuries.

Grimes died on June 26, 2011, as a result of "delayed complications of gunshot wounds." The morning of his death, Grimes's mother visited him in the hospital, and she testified at trial that, during that last visit, Grimes told her that he was "right with God" and that he wanted her "to forgive" him "if [he did] anything to disrespect [her] or [she] had a hard time with [him]." Grimes implored his mother "to forgive Josh and Doo-Doo," indicating that he would "never know why they did this but [she had] to forgive them." On the same day, at Grimes's insistence, his mother summoned a family friend, Cathy Morgan, to the hospital; when Morgan arrived, Grimes pleaded with her to take care of his mother. Grimes died minutes after speaking with Morgan.

Leonard and Alexander were apprehended in July 2011, and at that time, Leonard had in his possession a plastic bag containing approximately 13.8 grams of marijuana. The marijuana was divided and individually wrapped in 17 different packs known as "dime bags," indicating it was intended for distribution. While detained before trial in the Muscogee County jail, Leonard shared a dormitory-style room with several other men. A bunkmate who shared space with Leonard for nine months testified that he overheard Leonard gloating to other inmates about the shooting. The bunkmate testified that, when Leonard received the State's discovery packet, he hung a photograph of Grimes taken during the autopsy on the wall and bragged about both killing Grimes and preferring a .40-caliber pistol. Leonard also showed other autopsy photographs to his fellow inmates and told them "this is what a snitch look[s] like . . . [t]his [is] what happened to him."

2. Leonard first contends that the trial court erred by admitting as dying declarations Grimes's statements identifying Leonard as the shooter. As explained below, we conclude that the trial court

6

properly admitted the statements Grimes made soon after regaining consciousness and on the day he died. With respect to the intervening statements, even assuming that the trial court erred by admitting the statements as dying declarations, we conclude that any such error was harmless.

Before trial, Leonard moved to exclude Grimes's statements, and a hearing was held on Leonard's motion. At that hearing, two of Grimes's treating physicians, Dr. Vincent Nicolais and Dr. Richard Hannay, testified about Grimes's injuries, his dependency on a ventilator, and his status as a quadriplegic. Dr. Nicolais, who treated Grimes in October and November 2010, noted that Grimes's prognosis was "dismal." Dr. Hannay testified that Grimes "was aware of what was going on" and that Grimes was "critically ill," which, he explained, meant that "death could occur at any time without notice and be very sudden . . . [e]ven under the best of care[.]" In Dr. Hannay's opinion, Grimes's long-term prognosis was "very poor," he was at high risk for life-threatening infections, and his "medium-term probability of death was at a hundred percent."

7

Following the hearing, the trial court denied Leonard's motion, concluding that Grimes was aware that he was within the "article of death" when he made the challenged statements and that the fact that Grimes "died about ten months from the day he was shot multiple times is [more] a testament to modern science." In reaching this conclusion, the trial court credited the testimony of Grimes's treating physicians, including Dr. Hannay's testimony that Grimes was aware of his condition. The trial court also pointed to Grimes's statements to his mother about forgiving his assailants, noting that such statements "are of the kind that shows awareness of the nearness of one's own death."

We review a trial court's ruling admitting or excluding evidence for an abuse of discretion. See *Bolling v. State*, 300 Ga. 694, 698 (2) (797 SE2d 872) (2017). OCGA § 24-8-804 (b) (2) ("Rule 804 (b) (2)"), an exception to the rule excluding hearsay, provides that an out-of-court statement "made by a declarant while believing that his or her death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death" may be

admitted in a homicide prosecution where the declarant is unavailable to testify. Georgia Rule 804 (b) (2) is materially identical to Federal Rule of Evidence 804 (b) (2). When we consider the meaning of such a provision, "we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit for guidance." (Citation and punctuation omitted.) *State v. Hamilton*, 308 Ga. 116, 121 (3) (a) (839 SE2d 560) (2020). See also *Bolling*, 300 Ga. at 698 (2) ("When we consider the meaning of [OCGA § 24-8-804], we may consider the decisions of federal appellate courts . . . construing and applying our rule's federal counterpart."). "Moreover, although Advisory Committee Notes are not binding precedent and cannot change the plain meaning of the law or rules, they are highly persuasive." (Citation and punctuation omitted.) *Martinez-Arias v. State*, 313 Ga. 276, 286 (3) n.8 (869 SE2d 501) (2022).

Under Federal Rule 804 (b) (2), "[a] dying declaration is admissible as an exception to hearsay if the declarant makes the

9

statement while conscious of impending death and under the belief that there is no chance of recovery." (Citation and punctuation omitted.) *United States v. Peppers*, 302 F3d 120, 137 (III) (C) (2) (3d Cir. 2002). See also *United States v. Lawrence*, 349 F3d 109, 116 (II) (B) (1) (3d Cir. 2003) (for statement to be admissible as dying declaration, "the declarant must have spoken with the consciousness of a swift and certain doom" (citation and punctuation omitted)). As the United States Supreme Court has explained,

> [t]here must be a "settled hopeless expectation" that death is near at hand, and what is said must have been spoken in the hush of its impending presence. Despair of recovery may indeed be gathered from the circumstances if the facts support the inference. There is no unyielding ritual of words to be spoken by the dying. Despair may even be gathered though the period of survival outruns the bounds of expectation. What is decisive is the state of mind. Even so, the state of mind must be exhibited in the evidence, and not left to conjecture.

(Citations and punctuation omitted.) *Shepard v. United States*, 290 U. S. 96, 100 (1) (54 SCt 22, 78 LE 196) (1933).[4] See also *Peppers*,

---

[4] Federal Rule 804 (b) (2) codifies and broadens the common law's long-standing hearsay exception for dying declarations, but while the Rule is "considerably more liberal than the common-law exception," its applicability

10

302 F3d at 137 (III) (C) (2) ("A court may infer knowledge of the seriousness of a declarant's condition from the nature and extent of the wounds inflicted." (citation and punctuation omitted)). And while a general fear for one's life is insufficient to demonstrate an impending sense of death, it is well established that a declarant need not die shortly after making a statement in order for that statement to be admissible as a dying declaration. See *Mattox v. United States*, 146 U. S. 140, 151 (13 SCt 50, 36 LE 917) (1892) ("[I]t is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible." (citation and punctuation omitted)).

---

"still depends," as it did at common law, "on the declarant's belief that death was imminent at the time of the statement." *United States v. Williams*, 837 F2d 1009, 1012 (II) (A) n.5 (11th Cir. 1988). See also Advisory Committee Note on Federal Rule 804 (b) (2) (explaining that "[t]he exception is the familiar dying declaration of the common law, expanded somewhat beyond its traditionally narrow limits"); McCormick on Evidence, § 310 ("Evidence that would satisfy the common law would clearly satisfy [Federal Rule 804 (b) (2)], and a growing number of courts have recognized that a lesser showing will suffice."). Thus, in assessing whether a declarant's statement was made while the declarant believed death to be imminent, federal courts frequently look to decisions that pre-date the 1975 codification of Federal Rule 804 (b) (2) and apply the common-law exception. See, e.g., *Lawrence*, 349 F3d at 116 (II) (B) (1) (relying on *Shepard*, 290 U. S. at 100-103 (1), decided in 1933).

Turning first to the statements Grimes made to his mother, his girlfriend, and Detective Fairbairn shortly after regaining consciousness, Leonard asserts that the statements were improperly admitted because, he says, Grimes's death was not imminent at the time he made the statements and, even if it were, Grimes was not aware of it.[5] As an initial matter, Leonard misapprehends the pertinent inquiry. Indeed, as the plain language of Rule 804 (b) (2) makes clear, the issue is not whether the declarant's death was in fact imminent at the time of the declaration but whether the declarant believed it to be so. And here, the State presented significant evidence to support the inference that Grimes believed his death to be imminent, including testimony that Grimes remained in the intensive care unit when he made the statements, that the severity of his injuries resulted in Grimes's complete paralysis beyond his ability to slightly move his head and facial features, that he was entirely dependent on a ventilator, that he was

---

[5] Leonard does not dispute that Grimes was unavailable for trial or that the statements at issue concerned the cause or circumstances of Grimes's death.

at a high risk of death due to his injuries, and that he was aware of his grievous condition. Indeed, the physicians' testimony underscored the severity of Grimes's condition, with Dr. Hannay testifying that Grimes's chance of death from complications of his injuries was 100 percent in the "medium term," that "death could occur at any time without notice and be very sudden," and that Grimes was aware of his condition. Based on this evidence, "[i]t is reasonable to infer that [Grimes] knew about the seriousness of his condition" and was contemplating his impending death when he initially identified Leonard and Alexander as the shooters. *Webb v. Lane*, 922 F2d 390, 396 (II) (A) (2) (7th Cir. 1991) (facts supporting inference that declarant, who had suffered multiple gunshot wounds, believed death was imminent included his attachment to a life-support machine and officer's informing declarant that doctors believed his chances for survival were "not especially good"). See also *Mobley v. United States*, 421 F2d 345, 347-348 (5th Cir. 1970) (declarant's sense of impending death was properly inferred from the "gravity and extent" of his wounds, as evidenced by treating

13

physician's testimony, despite fact that declarant was not told that death was imminent). Compare *United States v. Two Shields*, 497 F3d 789, 793 (8th Cir. 2007) (despite severity of injuries and declarant's quick death, statements not admissible as dying declarations because no doctor had diagnosed injuries as life-threatening and declarant never indicated a belief of impending death). We thus cannot say that the trial court abused its discretion by admitting these statements as dying declarations.

Turning next to the statements Grimes made to his mother on the day of his death imploring her to forgive Leonard and Alexander, Leonard maintains that these statements were improperly admitted because Grimes's death was not imminent and because Grimes did not believe it to be so. In support of this contention, Leonard points to the fact that, shortly before his death, Grimes had been readmitted to the hospital for a "routine procedure." But, as we noted above, whether Grimes's death was actually imminent is beside the point; the question is whether Grimes believed it to be so. In answering that question affirmatively, the trial court looked to

14

the content of Grimes's statements — namely, the expressions of forgiveness toward his assailants and his exhortations to his mother encouraging her likewise to forgive his assailants — to find that, at the time of the statements, Grimes maintained "a settled hopeless expectation that death [was] near at hand." *Shepard*, 290 U. S. at 100 (1) (a declarant speaks with consciousness of impending death where she "announc[es] to the survivors a definitive conviction, a legacy of knowledge on which the world might act when she had gone"). In addition to the statements' content, the context of Grimes's statements, which were made while he was hospitalized and nearly contemporaneously with his insistence that Cathy Morgan be urgently summoned so that he could implore her to take care of his mother, supports a finding that Grimes was contemplating his imminent death. We therefore cannot say that the trial court here abused its discretion by admitting Grimes's statements made on the day of his death.

The trial court also admitted as dying declarations several statements Grimes made to various friends and family members in

15

the months after he was discharged from the hospital. Leonard challenges the admission of these statements as well. Pretermitting whether the trial court erred by admitting these statements, the substance of the statements — that Leonard and Alexander were responsible for Grimes's shooting — is essentially cumulative of other evidence, including nearly identical statements that Grimes made to his mother and others and the testimony of Leonard's bunkmate that Leonard bragged to his fellow inmates about shooting and killing Grimes. See *Davis v. State*, 302 Ga. 576, 583-584 (4) (805 SE2d 859) (2017) (even if statement fell outside hearsay exception, it was merely cumulative of other evidence, and its admission was therefore harmless); *Anglin v. State*, 302 Ga. 333, 336 (2) (806 SE2d 573) (2017) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced."). In light of the evidence discussed above, we conclude that it is highly probable that the admission of these functionally identical statements did not contribute to the verdict. See *Glispie v. State*, 300 Ga. 128, 131 (1)

16

(793 SE2d 381) (2016) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (citation and punctuation omitted)).

3. Next, Leonard asserts that Grimes's statements to Detective Fairbairn were testimonial and that their admission was in violation of Leonard's right to confrontation under the Sixth Amendment to the United States Constitution. See *Crawford v. Washington*, 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004). With respect to this claim, the record reflects that, following a hearing on Leonard's motion to exclude Grimes's statements, Leonard filed a supplemental brief concerning "dying declaration and necessity exceptions to testimonial hearsay in light of *Crawford v. Washington*." In that brief, Leonard expressly stated that "[a] dying declaration is an exception to he[ar]say as well as the rule of *Crawford*." The trial court subsequently ruled that Grimes's statements were admissible as dying declarations. Leonard did not object to the statements on the particular grounds that he now asserts — that the admission of Grimes's statements as dying

17

declarations ran afoul of *Crawford* — and the trial court made no ruling on that claim. Thus, we review this claim only for plain error. See *Goins v. State*, 310 Ga. 199, 204 (4) (850 SE2d 68) (2020); OCGA § 24-1-103 (d). To demonstrate plain error, Leonard

> must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

(Citation and punctuation omitted.) *Carter v. State*, 315 Ga. 214, 222 (3) (b) (881 SE2d 678) (2022). "The failure to meet one element of this test dooms a plain error claim, and so it is here." (Citation omitted.) *Denson v. State*, 307 Ga. 545, 548 (2) (837 SE2d 261) (2019).

In *Crawford*, the United States Supreme Court held that "the admission of out-of-court statements that are testimonial in nature violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination." (Citation and punctuation omitted.) *State v. Gilmore*,

312 Ga. 289, 290 (862 SE2d 499) (2021). See also *Crawford*, 541 U. S. at 68 (V) (C). The *Crawford* Court also suggested, but did not decide, that dying declarations, even if testimonial, may present an exception to the Confrontation Clause. Id. at 56 (III) (B) n.6 ("Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations." (citations omitted)). And as Leonard acknowledges, neither the United States Supreme Court nor the United States Court of Appeals for the Eleventh Circuit has yet made a definitive ruling on the issue.[6] Nevertheless, Leonard asserts that, assuming such an exception is recognized by

---

[6] Some of our own case law seems to suggest in dicta that this question has been resolved in Georgia. See *Durham v. State*, 296 Ga. 376, 380 (2) n.4 (768 SE2d 512) (2015); *Walton v. State*, 278 Ga. 432, 434 (1) (603 SE2d 263) (2004). But those cases suggest that *Crawford* definitively held that dying declarations do not implicate the Confrontation Clause. As we note above, however, *Crawford* expressly left that question open. We thus disapprove *Durham* and *Walton* to the extent they suggest that the Confrontation Clause question related to dying declarations that was reserved in *Crawford* is anything but an open question of federal constitutional law. And we are unaware of any of our own precedent that independently analyzes that question either.

this Court,[7] the exception is limited to statements satisfying "the common law exception [for dying declarations] contemporaneous to the Sixth Amendment's ratification," and, he says, Grimes's statements do not meet that standard. But Leonard points to no controlling authority, and we have found none, to support this claim. Leonard thus has failed to show clear and obvious error, as "the absence of clear authority to support the proposition that [Leonard] advances prevents the establishment of plain error[.]" *Simmons v. State*, 299 Ga. 370, 375 (2) (788 SE2d 494) (2016). See also *Wilson v. State*, 291 Ga. 458, 460 (729 SE2d 364) (2012) ("An error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." (citation and punctuation omitted)). Accordingly, this claim fails.

4. Leonard next challenges the trial court's denial of his motion to sever Count 7 (possession of marijuana with intent to distribute)

---

[7] Leonard advances no argument as to whether this Court should or should not recognize such an exception.

from the remaining charges. It does not appear from the record, however, that Leonard obtained a ruling on his motion to sever. Leonard filed in the trial court a "motion in limine to exclude any reference to the circumstances of [Leonard's] arrest or the charge of possession of marijuana with intent or motion for severance of indictment." Leonard's motion focused on the admissibility of evidence surrounding the circumstances of his arrest and only obliquely referenced severance, stating in passing that "the State would have recourse to pursue the drug charge in a later trial in the same manner as when a case is bifurcated in order to prevent prejudice when a defendant is a convicted felon." And the trial court's oral ruling, which was not reduced to writing, addresses only the admissibility of evidence of the circumstances of Leonard's arrest, not severance.[8] Because Leonard "failed to obtain a ruling on the issue, [he] cannot raise it for the first time in this Court." *Johnson v. State*, 301 Ga. 205, 208 (III) (800 SE2d 296) (2017). See

---

[8] Nor did the trial court address the issue in denying Leonard's motion for new trial.

also *Guffie v. State*, 304 Ga. 352, 355-356 (3) (818 SE2d 608) (2018) (argument waived for purposes of appeal where appellant challenged denial of motion to sever but "never presented [the] argument to the trial court either in his motion to sever or during the hearing on same"). We therefore conclude that Leonard has waived this argument for purposes of appeal.[9]

5. During closing argument, Leonard sought to cast doubt on the veracity of Grimes's family members and friends who testified about Grimes's statements identifying Leonard and Alexander as the shooters, insinuating that Grimes did not make the statements about which they testified. In response, the prosecutor argued:

> Who [Grimes] said did it is who they went after. And who [Grimes] said did it is the same person they said over, and over, and over. And who would [Grimes] have said this to? To his family members, to those who come, to those who are there next to him. Why would [Grimes] say this to everybody who c[a]me his way? You know why he would say it. I thought about it for a while. I was taken to the 55th number of Psalms, verses 12, King David is

---

[9] We note that this claim may not be reviewed for plain error. See *Brooks v. State*, 309 Ga. 630, 638 (3) (847 SE2d 555) (2020) (identifying claims that are subject to plain error review and noting that "[t]his Court has declined to extend plain error analysis to other claims of error in the absence of a specific provision by the General Assembly").

saying: Now it is not an enemy who insulted me —

Leonard's counsel objected to the prosecutor's use of scripture, which the trial court overruled. The prosecutor continued:

> This is what happened again, Psalm 55 verse 12 said: Now, it is not an enemy who insulted me. Otherwise I could bear it. It is not a foe who rise up against me. Otherwise I could hide from him. But it is you, who is my peer, my companion and good friend, we used to fellowship, close fellowship. We would walk with the crowd into the house of God.
>
> That's why he's telling everybody. He can't believe that it was his friend. He can't believe that it was Doo-Doo who would do something like this. That's why everybody he finds he turns and he says: Josh, Doo-Doo. He can't believe it. If it had been an enemy, he could have protected his self, but it was you. You, the one who slept at my house, who ate at my table.

On appeal, Leonard contends that this ruling was erroneous and that a curative instruction was warranted. We disagree.

Counsel is afforded wide latitude during closing argument, the scope of which is a matter for the trial court's discretion. *Arnold v. State*, 309 Ga. 573, 577 (2) (a) (847 SE2d 358) (2020). We judge closing arguments "in the context in which they are made." (Citation and punctuation omitted.) *Blaine v. State*, 305 Ga. 513, 519 (2) (826

23

SE2d 82) (2019). A prosecutor may "discuss and draw inferences from factual matters in evidence . . . [and] respond to points made in — and issues omitted from — the defendant's closing argument." (Citation and punctuation omitted.) Id. Likewise, a prosecutor "is allowed to make illustrations that may be as various as are the resources of his genius," (citation and punctuation omitted) *Arnold*, 309 Ga. at 577 (2) (a), and "may allude to such principles of divine law relating to transactions of men as may be appropriate to the case," (citations and punctuation omitted) *Greene v. State*, 266 Ga. 439, 450 (26) (469 SE2d 129) (1996), reversed on other grounds by *Greene v. Georgia*, 519 U. S. 145 (117 SCt 578, 136 LE2d 507) (1996).

Reading closing arguments as a whole, we cannot say that the trial court abused its discretion when allowing the prosecutor's reference to scripture, which was permissible rebuttal. Indeed, the prosecutor attempted to defuse Leonard's argument and offer an explanation as to why Grimes repeatedly identified Leonard and Alexander, resorting to Biblical references for a more expressive description of the idea of betrayal. And this theme was supported by

the evidence; Grimes's mother and others testified that Alexander was one of Grimes's best friends and that Grimes was shocked that Alexander would hurt him. See *Greene*, 266 Ga. at 450 (26); *Lewis v. State*, 287 Ga. 210, 213 (5) (695 SE2d 224) (2010) ("Counsel may make use of well-established historical facts in his argument and make full use of illustrations as long as he does not introduce extrinsic and prejudicial matters which have no basis in the evidence." (citation and punctuation omitted)). Under these circumstances, we cannot say that the trial court abused its broad discretion by overruling Leonard's objection and not giving a curative instruction. See *Blaine*, 305 Ga. at 519 (2).

6. Leonard next challenges the trial court's denial of his motion to dismiss the indictment for want of a speedy trial. This claim is unavailing.

"When an accused claims that a delay in bringing him to trial has worked a denial of his constitutional right to a speedy trial, a court first must consider whether the delay is long enough to raise a presumption of prejudice and to warrant a more searching judicial

inquiry into the delay." *State v. Johnson*, 291 Ga. 863, 864 (1) (734 SE2d 12) (2012). Here, Leonard was arrested in July 2011. In February 2013, Leonard, who had yet to be indicted, filed a constitutional and statutory demand for a speedy trial, and in March 2013, he moved to dismiss the case against him for want of a speedy trial. The trial court denied his motion in February 2014, only weeks after the grand jury returned an indictment against Leonard. In light of the 30-month delay between Leonard's arrest and the denial of his speedy trial motion,[10] the presumptive prejudice "threshold was crossed," and the inquiry "proceeds to the second part of the [*Barker*[11]] framework, applying a context-focused, four-factor balancing test to determine whether the defendant was denied the right to a speedy trial." (Citation and punctuation omitted.) *Redding*

---

[10] The State properly conceded the issue of presumptive prejudice below. See *Redding v. State*, 313 Ga. 730, 732 (2) (873 SE2d 158) (2022) ("A delay of one year or more is typically presumed to be prejudicial."); *State v. Porter*, 288 Ga. 524, 526 (2) (b) (705 SE2d 636) (2011) ("Where a trial has not occurred, the delay should be calculated from the date of arrest or other formal accusation to the date on which a defendant's speedy trial motion was granted or denied[.]").

[11] *Barker v. Wingo*, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972). See also *Doggett v. United States*, 505 U. S. 647 (112 SCt 2686, 120 LE2d 520) (1992).

*v. State*, 313 Ga. 730, 732 (2) (873 SE2d 158) (2022). Specifically, a court must consider and balance "(1) the length of the delay; (2) the reasons for it; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant." (Citation and punctuation omitted.) Id.

This analysis requires courts to "engage in a difficult and sensitive balancing process," while bearing in mind that "[t]hese four factors have no talismanic qualities" and "must be considered together with such other circumstances as may be relevant." (Citation and punctuation omitted.) *State v. Pickett*, 288 Ga. 674, 675 (2) (a) (706 SE2d 561) (2011). "[T]he application of these principles to the circumstances of a particular case is a task committed principally to the discretion of the trial courts, and it is settled law that our role as a court of review is a limited one." *State v. Buckner*, 292 Ga. 390, 391 (738 SE2d 65) (2013).

(a) *Length of the delay*

"As the trial court found and the State concedes, th[e] delay" — here, 30 months — "was 'presumptively prejudicial,' and the trial

27

court was correct to weigh the length of the delay against the State."

*Henderson v. State*, 310 Ga. 231, 236 (2) (a) (850 SE2d 152) (2020).[12]

(b) *Reasons for the delay*

The trial court attributed responsibility for the delay to the State but found "no evidence that the delay was the result of any intentional or deliberate action by the State to hamper the defense." Three reasons were proffered for the delay: that the State first sought to proceed with the prosecution of Alexander for an unrelated murder charge; that Grimes's girlfriend had been indicted for an additional unrelated murder and the State sought to determine her availability as a witness; and that the State sought additional DNA testing on evidence recovered from the crime scene. Finding that the State was entitled to collect additional evidence and that the delay was "the result of the circumstances surrounding [Alexander], [Grimes's girlfriend] and testimonial evidence," the trial court concluded that this factor was "relatively benign" and "weighed only

---

[12] Contrary to Leonard's assertion, the trial court, in fact, did find that the delay in this case was uncommonly long, and its order reflects that it properly weighed this factor against the State.

28

lightly against the State." On appeal, Leonard asserts that the trial court "misapplied the law" in assigning only "relatively benign" weight to this factor because, he says, the State delayed the trial for the purpose of gaining a "tactical advantage," such that this factor should have been weighed heavily against the State. We agree that this factor deserved more than the "relatively benign" weight assigned by the trial court, though not to the extent Leonard urges.

"In assessing the reasons for the delay, the trial court must consider which party was responsible for the delay, whether the delay was intentional, and, if it was intentional, what the motive was for seeking or causing the delay." *Davis v. State*, 315 Ga. 252, 256 (2) (d) (ii) (882 SE2d 210) (2022). As to the amount of weight assigned to this factor, "different weights should be assigned to different reasons." (Citation and punctuation omitted.) *Johnson*, 291 Ga. at 865 (2) (b). "[A] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government," and "an unintentional delay, such as that caused by the prosecuting attorney's mere negligence or the trial court's

29

overcrowded docket, should be weighted less heavily." (Citation and punctuation omitted.) *State v. Alexander*, 295 Ga. 154, 157 (2) (b) (758 SE2d 289) (2014).

As to the first and second reasons for the delay — that Grimes's girlfriend and Alexander each had been indicted on unrelated charges — Leonard contends that the State chose to proceed first with the prosecutions against Grimes's girlfriend and Alexander in the hope of securing their testimony against Leonard and thereby gaining a tactical advantage, which, he argues, should weigh heavily against the government. The facts of this case are analogous to *Jackson v. State*, 272 Ga. 782, 784 (534 SE2d 796) (2000). In *Jackson*, the prosecution delayed the appellant's trial in order to try the appellant and his co-defendants together, and in opposing the appellant's speedy trial claim, the State argued that "because th[e] delay was not intentional, it is of no consequence." Id. We rejected that argument, reasoning that "[w]hile there is no evidence that this was a deliberate attempt to 'hamper the defense,' neither is it negligence which is 'relatively benign.' [The reason for the delay] is

therefore weighted against the [S]tate." (Citation omitted.) Id. That rationale applies here. Though there is no evidence that the delay was designed to hamper Leonard's case, the delay cannot be chalked up to negligence and must be afforded more than "relatively benign" weight. See id. See also *Johnson*, 291 Ga. at 865 (2) (b) ("The unavailability of State witnesses weighs against the State." (citation and punctuation omitted)).

Turning to the third reason — that the State sought to analyze DNA evidence recovered at the crime scene — Leonard complains about the State's failure to do so in a timely manner, noting that the State did not obtain a DNA sample from him until November 2013, more than two years after his arrest. Leonard does not, however, contend that the State's delay in collecting a DNA sample resulted from anything other than "negligent inaction," which is properly weighed "benignly" against the State. See *Buckner*, 292 Ga. at 396 (3) (b).

(c) *Assertion of the right*

The trial court weighed the third factor heavily against

Leonard, finding that Leonard waited more than nineteen months before asserting his right to a speedy trial despite being represented by counsel within one month of his arrest. The record supports that finding, and the trial court did not abuse its discretion by weighing this delay heavily against Leonard.[13] See *Brown v. State*, 287 Ga. 892, 896 (2) (c) (700 SE2d 407) (2010) (appellant's two-year delay in asserting right to speedy trial was properly weighed heavily against him); *Buckner*, 292 Ga. at 396 (3) (c) ("Once the right to a speedy trial attaches, the accused must assert it with reasonable promptness, and delay in doing so normally will be weighed against him." (citation and punctuation omitted)).

(d) *Prejudice*

The trial court did not abuse its discretion by determining that Leonard failed to establish that he was prejudiced by the delay in

---

[13] To the extent Leonard argues that his failure to invoke his speedy trial right sooner was attributable to the State's failure to indict him, such a contention is without merit. See *Ruffin v. State*, 284 Ga. 52, 63 (2) (b) (iii) (663 SE2d 189) (2008) ("[I]nvocation of the speedy trial right need not await indictment, information, or other formal charge; the accused can begin demanding that the right to a speedy trial be honored as soon as he or she is arrested." (citation and punctuation omitted)).

bringing his case to trial. "The prejudice associated with unreasonable delay before trial includes oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the (accused's) defense will be impaired by dimming memories and loss of exculpatory evidence." (Citation and punctuation omitted.) *Henderson*, 310 Ga. at 239 (2) (d). "Of these forms of prejudice, the most serious is the last[.]" (citation and punctuation omitted.) Id.

With respect to the prejudice factor, the trial court found that "no evidence [had been] presented to show actual prejudice or impairment [of] Leonard's defense." Leonard now argues that recordings of a 911 call and a tipster call were destroyed by the time of trial and that his defense was thereby prejudiced. In support of this contention, Leonard points to trial counsel's testimony that this evidence could have been helpful in identifying witnesses to the shooting. But this testimony was presented at the hearing on Leonard's motion to supplement the appellate record, and it does not appear from the record — nor does Leonard argue — that he raised

33

this claim in the trial court. Indeed, the record supports the trial court's finding that Leonard failed to present any evidence that his defense was impaired; thus, the trial court properly weighed this factor against Leonard.[14] See *Ruffin v. State*, 284 Ga. 52, 64 (2) (b) (iv) (663 SE2d 189) (2008).

(e) *Balancing the four factors*

In light of the trial court's error with respect to the weight afforded to the second factor, our deference to the trial court's denial of Leonard's motion is somewhat diminished. Nevertheless, we conclude that "had the trial court used the correct facts and legal analysis, it would have had no discretion to reach a different judgment." *Pickett*, 288 Ga. at 679 (2) (d). To be sure, "[g]iven [Leonard's] failure to present any persuasive evidence of 'prejudice' as that term is used in the *Barker-Doggett* analysis," as well as "the fact that [Leonard] asserted the speedy trial right relatively late in

---

[14] Contrary to Leonard's assertion, the trial court's conclusion as to prejudice was not based solely on its finding that Leonard was incarcerated for a probation violation. See *Redding*, 313 Ga. at 736 (2) (trial court erred by "ruling that [a]ppellant's probation hold precluded the need to assess prejudice associated with oppressive pretrial incarceration").

the process," we cannot say that the trial court abused its discretion by denying Leonard's motion to dismiss. *Ruffin*, 284 Ga. at 65-66 (3).

7. Finally, Leonard summarily asserts that the cumulative effect of the trial court's errors was harmful and entitles him to a new trial. But as set forth above, we have identified no error that would require cumulative consideration. See *Pritchett v. State*, 314 Ga. 767, 787 (4) (879 SE2d 436) (2022) (To establish cumulative error, an appellant "must show that at least two errors were committed in the course of the trial, and when considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied him a fundamentally fair trial." (citation and punctuation omitted)). Indeed, we did not identify any error and have pretermitted error only with respect to the admission of Grimes's statements identifying the shooters that were made between his initial conscious moments in the hospital and the day of his death. And we held the admission of that evidence to be harmless. In the absence of any other error or pretermitted error, there is nothing for us to consider with respect to this enumeration.

*Judgment affirmed. All the Justices concur.*

Decided June 21, 2023 — Reconsideration denied July 13, 2023.

Murder. Muscogee Superior Court. Before Judge Rumer.

*Ryan C. Malone*, for appellant.

*Stacey S. Jackson, District Attorney, Frederick Lewis, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Emily R. Polk, Assistant Attorney General*, for appellee.