**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 4, 2025

S24A1002. RILEY v. THE STATE.

ELLINGTON, Justice.

Yathomas Riley, representing himself, appeals his convictions for malice murder and other crimes in connection with the shooting death of his wife, Dr. Lisa Marie Riley, in the presence of their infant son, G.W.R.[1] Riley contends that the trial court erred by allowing

---

[1] The crimes occurred on June 14 and July 9, 2015. On August 26, 2015, a Lee County grand jury indicted Riley for malice murder, felony murder, three counts of aggravated assault of Lisa on June 14, one count of aggravated assault of Lisa on July 9, and one count each of aggravated assault of G.W.R. by family violence and cruelty to children in the first degree. After a jury trial that ended on June 24, 2016, Riley was found guilty on all counts. On July 1, 2016, Riley was sentenced to serve life in prison without the possibility of parole for malice murder, consecutive 20-year prison terms for one count of aggravated assault of Lisa on June 14, 2015 and for cruelty to children, and concurrent 20-year prison terms for two counts of aggravated assault of Lisa on June 14 and for aggravated assault by family violence. The felony murder count was vacated by operation of law, and the count of aggravated assault of Lisa on July 9 was merged into the malice murder conviction. The indictment also charged Riley with one count of aggravated assault of five persons that allegedly occurred on May 25, 2015, but that count was not presented to the jury and was nolle prossed after trial.

the lead investigator to remain in the courtroom during the trial, that allegedly false or inaccurate evidence was presented to the grand jury and at trial, and that Riley's trial counsel provided constitutionally ineffective assistance and also caused a structural error by conceding Riley's guilt.[2] For the reasons explained below, we affirm.

The State presented evidence at trial showing that on the night

Riley filed a timely motion for new trial, which he amended through new counsel on February 12, 2020. After Riley requested a ruling on the first ground of his amended motion without a hearing, the trial court denied the motion as to that ground. After a hearing on the remaining grounds on February 7, 2023, the trial court entered a final order denying Riley's amended motion for new trial on August 23, 2023.

Riley filed a timely pro se notice of appeal to the Court of Appeals on September 21, 2023, and the Court of Appeals transferred the case to this Court on November 30, 2023. In Case Number S24A0419, we remanded Riley's case to the trial court on January 26, 2024, and, on April 3, 2024, the trial court determined that Riley made a knowing and voluntary decision to represent himself on appeal after receiving extensive and specific warnings. The case was then transmitted back to this Court, redocketed to the August 2024 term, and submitted for a decision on the briefs.

[2] Although Riley's appellate brief sufficiently raised these contentions, he also has filed many supplemental briefs that we do not consider because they were filed without leave of this Court as required by Supreme Court Rule 24 (2). Moreover, to the extent that Riley attempts to use those briefs to respond to the State's arguments, they cannot be considered for that purpose because none of them was filed within the time allowed for reply briefs under Supreme Court Rule 10 (2), and no extension of time was requested. To the extent that Riley raises new issues in his supplemental briefs, they cannot be considered because "[s]upplemental briefs may not be used to expand the enumeration of errors." Supreme Court Rule 24 (3).

of July 9, 2015, Riley shot and killed Lisa in their bedroom in close proximity to G.W.R. At the time of her death, Lisa was an emergency room physician at Phoebe Putney Memorial Hospital in Albany. For some time, Lisa's mother, colleagues, and friends had been worried about her relationship with Riley because his behavior was "self-centered," "controlling," "jealous," and possibly "abusive." Lisa's colleagues also testified that nothing made them suspect Lisa was suicidal.

Less than a month before the shooting, Riley was arrested for threatening to kill Lisa with a gun. On June 14, 2015, Lisa called 911 to report a domestic incident. Riley was stopped after he left their house in a red convertible with several weapons, including a .380-caliber semi-automatic pistol in his pants. A sheriff's deputy then went to the Riley house, where Lisa was "upset and crying," with red marks on her neck and upper chest. Lisa's mother received a phone call from Lisa, who "barely could speak" and "couldn't breathe" but managed to say that Riley "tried to kill" her.

On the morning of July 10, 2015, Riley called 911. When

paramedics arrived at the house, Riley came out with G.W.R. and yelled for them to go inside the house. The paramedics found Lisa in the master bedroom, "obviously deceased" in rigor mortis. There was a firearm on the floor above Lisa's head, and a large amount of blood all over the floor, furniture, and body, including some that "seemed to be smeared," but no blood on G.W.R., who was wearing only a diaper at the time. Riley repeatedly asked to go back into the house to retrieve a cell phone, but, during a pat-down of Riley, an investigator at the scene found both Riley's and Lisa's phones in Riley's pants pockets. The investigator testified at trial that, based on the crime scene, it was his opinion that Lisa did not shoot herself. Riley was taken into custody at a later time when a previous bond was revoked, and he was subsequently arrested for murder.

Video from surveillance cameras at the Riley house was collected and reviewed. As the video was played for the jury, a GBI special agent testified that, at 8:12 p.m. on July 9, 2015, Riley can be seen entering the front door of the house, and shortly after that, Lisa walked down the hallway toward the bedrooms with G.W.R.

4

crawling behind her. The last time Lisa appeared in any footage was 8:16 p.m. About 15 minutes later, Riley left the house alone in a white V-neck T-shirt that was later recovered and found to have blood spatter on the front. There was no further movement on the footage until about 8:25 a.m. the next morning, when a vehicle pulled into the driveway. Riley can be seen in the white V-neck T-shirt talking on the telephone at about 8:32 a.m., and paramedics arrived at 8:35 a.m.

A GBI firearms examiner testified that a bullet removed from the bedroom wall was fired from a .380-caliber semi-automatic pistol; that bullet fragments removed from Lisa's skull and found under the bed came from a 9mm bullet that had been fired from the semi-automatic firearm found by Lisa's body; and that lead fragments found in G.W.R.'s "bouncy seat" and in a bullet defect on the floor were consistent with a round fired from a revolver that was never recovered or identified.

The GBI medical examiner who performed Lisa's autopsy explained that Lisa had a gunshot entry wound to the right

forehead. The bullet passed through her head in a downward, right-to-left trajectory, exiting behind the left ear and below the base of the skull. The bullet's trajectory was not typical of a self-inflicted wound. In nearly all suicides by a gunshot wound to the head, the gun is in contact with the skin, and the typical trajectory for the gunshot wound is from side to side. However, Lisa's gunshot wound was at close range with a steep downward trajectory, and the stippling and soot on her body indicated that the firearm was one to two inches from the skin. The medical examiner determined, based on her autopsy findings and the investigative information she received, that the manner of death was homicide.

A GBI criminal intelligence analyst testified that on the evening of July 9, 2015, at 9:20 to 9:21 p.m., Lisa's cell phone had one outgoing call to, and then two incoming calls from, the home phone number of Riley's then-attorney. And there were other outgoing calls to the Riley house during the night. Cell tower pings showed that after 9:40 p.m., Lisa's phone was moved from north Lee County where the house was located to the Albany area to Atlanta,

then was moved back down the highway, and was returned to north Lee County at 8:09 a.m. Riley's cell phone made the same journey around the same time. Lisa's cell phone had four phone calls to Riley's attorney between 8:25 and 8:28 a.m. on July 10, a six-minute call to 911 beginning at 8:31, and two subsequent calls to Riley's attorney.

A GBI special agent who was qualified as an expert in crime scene investigation, bloodstain pattern analysis, and shooting incident reconstruction testified that the numerous bullet fragments and marks observed in the bedroom indicated that there was "a bunch of shooting" with "a lot of" different kinds of firearms being fired into many different items. The special agent concluded that the blood spatter, bullet trajectory angle through Lisa's skull, and body position were consistent with someone shooting at Lisa, and not Lisa shooting herself. Examination of the clothes Riley was wearing at the scene revealed a reddish-orange discoloration on the front of his white V-neck T-shirt and a blood spatter pattern that appeared to be from "being in close proximity to a high-energy, high-

7

force velocity bloodshed event." It also appeared that someone attempted to clean the bathroom sink before law enforcement arrived. Baby clothing recovered from behind a doorway to the master bedroom tested positive for significant quantity of blood, including a "huge saturation stain" on the back from where the baby lay or sat in a large quantity of blood. A small bone fragment was embedded in the front of the baby clothing, indicating that G.W.R. was very close to his mother when the shooting occurred.

Testimony given by ADT service technician Bryant Brown suggested that the gunshots likely occurred while Riley was present in the master bedroom and that he then checked the system throughout the night to view footage from the security cameras. A product called "ADT Pulse" gives customers the ability to monitor the security system themselves and keeps records every time a device is tripped in any way, whether or not the system is armed. Customers can view "pulse logs" on their pulse account on either a computer or cell phone. Each person associated with the account has his own username and password, making it possible to tell who

8

logged into the account. After the murder, Brown made a list of each of the system's sensors by tripping each device in the security system while an assistant looked at the keypad to verify which sensor was tripped. Brown testified that the master bedroom's glass-break sensor was tripped on July 9, 2015, at 8:23 p.m. and again at 8:26 p.m., which was before Riley was seen on video walking out of the room. The motion sensors in the house then tripped in a way indicating that someone walked out of the master bedroom, to the front hall, back to the master bedroom, back to the front hall, and then out the front door at 8:32 p.m. Between 9:51 p.m. and 2:08 a.m., Riley accessed the pulse system 21 times and viewed the footage from each of four security cameras. At 2:09 a.m., Riley used the pulse system to arm the security panel remotely. At 2:10 a.m., the security panel was disarmed, rearmed, and then disarmed again, all remotely. Between 3:14 and 7:30 a.m., Riley again accessed the pulse system 21 times. No windows were broken in the Riley house. Pursuant to a search warrant, the GBI special agent went with GBI Investigator Stephen Douglas to the Riley house to

9

test-fire the 9mm pistol in the master bedroom, which demonstrated that the glass break sensor in that room would be tripped by a sequence of multiple gunshots.

1. Riley contends that the trial court erred by allowing Investigator Douglas to remain in the courtroom during the trial. The trial court did not abuse its broad discretion in that regard.

Investigator Douglas was the lead case agent with the GBI, prepared "the master report," and "oversaw the investigative process" before being hired by the District Attorney. Riley filed a pre-trial motion to sequester all law enforcement witnesses. But, at the pre-trial motions hearing, the prosecutor requested that Investigator Douglas stay in the courtroom during the presentation of the case to the jury because the investigator had helped prepare the case for trial and was familiar with the voluminous evidence. The prosecutor expected Investigator Douglas to testify briefly on a few matters. Trial counsel objected based on the rule of sequestration. The trial court allowed Investigator Douglas to remain in the courtroom. Investigator Douglas ultimately was the

10

last witness to testify in the weeklong trial. He testified with respect to video recordings of the ballistics testing and the home alarm system, as well as a picture downloaded from a social media account of Riley's.

Georgia's rule of sequestration does "not authorize exclusion of . . . [a]n officer or employee of a party which is not a natural person designated as its representative by its attorney[.]" OCGA § 24-6-615 (2). Based on this provision, it is well settled, under both the state rule and Federal Rule of Evidence 615 (2),[3] that "[i]t is within a trial court's discretion to exempt the government's chief investigative agent from sequestration[.]" *Anderson v. State*, 307 Ga. 79, 88 (5) (834 SE2d 830) (2019). Because Investigator Douglas was the State's chief investigative agent, it was well within the trial court's discretion to exempt him from the rule of sequestration and to deny

[3] Notwithstanding the State's improper reliance on precedent under our old Evidence Code, "[t]he text of OCGA § 24-6-615 differs significantly from the text of the sequestration provision of the old Evidence Code, and instead tracks in pertinent part the language of Federal Rule of Evidence 615 as that rule read in 2011," and we therefore "look for guidance to the decisions of the federal appellate courts on Rule 615, not our precedent under the old Evidence Code." *Anderson v. State*, 307 Ga. 79, 88 (5) n.15 (834 SE2d 830) (2019) (citation and punctuation omitted).

Riley's objection on this ground. See id. Cf. *Lopez v. State*, 310 Ga. 529, 533-534 (3) (b) (852 SE2d 547) (2020) (holding that it was not ineffective assistance when the defendant's trial counsel failed to object to the State's request for its chief investigative agent to be allowed to remain in the courtroom, because an objection on this ground would have been meritless and the trial court would have acted within its discretion in denying it), overruled on other grounds by *Johnson v. State*, 315 Ga. 876, 877, 884 (2) (b) (885 SE2d 725) (2023).

2. Riley contends that his federal due process rights were violated when certain allegedly false or inaccurate evidence related to his home security system was presented to the grand jury and at trial.[4] Riley's claims concerning evidence presented to the grand jury

---

[4] Riley also claims under this enumeration that the trial judge, apparently by misrepresenting what Riley had preserved for review and by supposedly committing "perjury," violated Riley's right under the First Amendment of the United States Constitution to petition for redress of grievances. But "these arguments have been waived for purposes of this appeal, as a proper objection was not raised below with respect to these matters." *Atkinson v. State*, 301 Ga. 518, 522 (3) (801 SE2d 833) (2017). Plain-error review is not available because none of Riley's arguments involve any of the possible bases for such review in Georgia. See *Miller v. State*, 309 Ga. 549,

are not reviewable, and, as to his claims concerning evidence presented at trial, Riley either failed to preserve them for appeal or failed to meet his burden of showing error.

"[G]rand juries, unlike petit juries, are authorized to consider evidence without regard to its eventual admissibility at trial." *State v. Lampl*, 296 Ga. 892, 898 (2) (770 SE2d 629) (2015). Indeed, "[t]he evidence which the grand jury receives in finding a true bill is not subject to inquiry as to admissibility, confidentiality, relevance or

552 (2) (847 SE2d 344) (2020) ("In Georgia, plain error review is limited to the sentencing phase of a trial resulting in the death penalty, a trial judge's expression of opinion in violation of OCGA § 17-8-57, and a jury charge affecting substantial rights of the parties as provided under OCGA § 17-8-58 (b), and, for cases tried after January 1, 2013, with regard to rulings on evidence, a court is allowed to consider plain errors affecting substantial rights although such errors were not brought to the attention of the court. OCGA § 24-1-103 (d)." (citation and punctuation omitted)); *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018) (holding that plain-error review under OCGA § 24-1-103 (d) "is limited to the trial court's evidentiary rulings" and therefore did not apply to challenges to the constitutionality of certain statutes). Riley further claims that the trial judge should be impeached under the United States Constitution, but we have no jurisdiction to consider any such claim. See U.S. Const. Art. II, Sec. IV (providing for impeachment of "all civil Officers *of the United States*" (emphasis supplied)). See also U.S. Const. Art. I, Sec. II ("The House of Representatives . . . shall have the sole Power of Impeachment."); Ga. Const. of 1983, Art. III, Sec. VII, Par. I (The Georgia "House of Representatives shall have the sole power to vote impeachment charges against any . . . judicial officer of this state[.]").

prejudice, which evidentiary questions can be raised and resolved at trial." *Anderson v. State*, 258 Ga. 70, 73 (11) (365 SE2d 421) (1988). See also *Mitchell v. State*, 239 Ga. 456, 459 (3) (238 SE2d 100) (1977). "[W]here it appears that a competent witness or witnesses were sworn and examined before the grand jury by whom the indictment was preferred, . . . no inquiry into the sufficiency or legality of the evidence is indulged." *Ward v. State*, 288 Ga. 641, 643-644 (2) (706 SE2d 430) (2011) (holding that, where the appellant asserted "that the trial court erred in denying his motion to quash the indictment alleging that the grand jury heard testimony only from an investigator in the district attorney's office who did not have first hand knowledge of the case," the enumeration of error presented "nothing for review" (citation and punctuation omitted)). See also *Felker v. State*, 252 Ga. 351, 366 (2) (a) (314 SE2d 621) (1984) (quoted in *Ward*; rejecting dicta "implying any broader basis for quashing an indictment for lack of evidence"). Riley's claims related to the grand jury furnish no grounds for reversal, as he "has not shown that any grand jury witness was incompetent or not

14

sworn properly." *Young v. State*, 305 Ga. 92, 99 (7) (823 SE2d 774) (2019) (citation and punctuation omitted).

With respect to the trial itself, Riley briefly argues that the State violated his rights under *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963), by failing to disclose evidence.[5] But he fails to point to any specific undisclosed evidence that was favorable to him, and he therefore has failed to meet his burden of showing such evidence. See *Muse v. State*, 316 Ga. 639, 663 (8) (889 SE2d 885) (2023) (The appellant made a *Brady* claim of failure to disclose text messages and other data extracted from his cell phone but did not point to any data that he contended was exculpatory, and this Court held that he had "failed to carry his burden to show that

---

[5] To establish a violation under *Brady*, the defendant must show that: (1) the State, including any part of the prosecution team, possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed to the defense.

*Harris v. State*, 309 Ga. 599, 605-606 (2) (b) (847 SE2d 563) (2020) (citation and punctuation omitted). "The burden of proof on these elements lies with the defendant." *Muse v. State*, 316 Ga. 639, 662 (8) (889 SE2d 885) (2023) (citation and punctuation omitted).

the evidence was exculpatory.").

As for Riley's claim that false evidence and perjured testimony about the security system was presented at trial, he argues variously that Brown committed perjury when he testified about his evaluation of the system, that the ADT installation records and pulse logs admitted at trial had been falsified, and that this evidence was knowingly presented by the State. Riley purports to base this claim on his personal knowledge related to the installation and operation of his home security system, but he has not supported this assertion with his testimony or any other evidence  Because Riley's claim of false evidence and perjured testimony could have been raised at trial but was not, it has not been preserved for appeal. See *Davis v. State*, 316 Ga. 418, 424 (4) (b) (888 SE2d 546) (2023) ("Although we have serious doubts that [the appellant] has made the threshold showing that the prosecutor knowingly used perjured testimony or failed to correct what the prosecutor subsequently learned was false testimony, we need not reach these questions because we conclude that [the defendant's] claim was not preserved

16

since it was not raised at trial.").

3. Riley contends that his trial counsel provided constitutionally ineffective assistance by failing to investigate and prepare for trial properly. Riley asserts that his trial counsel's alleged failure to prepare for trial is demonstrated by his failure "to review the State's files and pretrial discovery," "to interview witnesses," "to request funds for" and "secure an expert witness in support of his theory of defense," "to request or review . . . Riley's medical records and fight history" as a boxer, "to secure a blood spatter expert to support his theory of victim suicide," and "to secure an expert witness on the alarm system at the marital residence." Riley also asserts that trial counsel failed to conduct a "reasonable investigation of witnesses who he himself opined would probably be helpful" and "to examine any of the many boxes of discovery that were provided by the State." Riley further asserts that counsel completely failed "to provide any expert testimony as to . . . Riley's medical history, medication, treating physicians or his boxing/fighting history that would suggest that he suffered from

17

CTE," chronic traumatic encephalopathy. Riley has wholly failed to meet his heavy burden of proving that trial counsel's alleged failures amounted to ineffective assistance.

To prevail on a claim of ineffective assistance, a defendant must prove both that the performance of his lawyer was deficient and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong of the *Strickland* test, the defendant "must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Lofton v. State*, 309 Ga. 349, 360 (6) (846 SE2d 57) (2020). "This requires a defendant to overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Scott v. State*, 306 Ga. 417, 419-420 (2) (831 SE2d 813) (2019) (citation and punctuation omitted). "Decisions regarding trial tactics and strategy may form the basis

18

for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Thomas v. State*, 311 Ga. 706, 714 (2) (a) (859 SE2d 14) (2021) (citation and punctuation omitted). The defendant must also show that the deficient performance prejudiced the defense, which requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). If an appellant "fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Williams v. State*, 315 Ga. 797, 806 (2) (884 SE2d 877) (2023). "The burden of proving ineffective assistance is a heavy one[.]" *Smith v. State*, 303 Ga. 643, 646 (II) (A) (814 SE2d 411) (2018).

Riley has presented his ineffective assistance claims "in a cursory manner." *Brown v. State*, 301 Ga. 728, 735 (4) (804 SE2d 16) (2017) (also involving a pro se appellant). And his list of "generalized assertions of his trial counsel's alleged failings" does not "show in

what respect his counsel's performance was deficient." *Jones v. State*, 319 Ga. 758, 764 (3) (906 SE2d 699) (2024). See also *Sauder v. State*, 318 Ga. 791, 816 (7) (f) n.21 (901 SE2d 124) (2024) ("To the extent [the appellant] has not identified specific instances of these alleged deficiencies, he has not carried his burden of showing that his lawyer performed deficiently."); *Howard v. State*, 318 Ga. 681, 686 (2) n.2 (899 SE2d 669) (2024) (holding that an enumeration of counsel's ineffectiveness for failing to "file a motion to suppress the photo lineup" was insufficient to raise any claim of ineffective assistance of counsel for our review); *Ward v. State*, 313 Ga. 265, 275 (4) (c) (869 SE2d 470) (2022) (holding that the appellant failed to demonstrate ineffectiveness of trial counsel because he did "not identify any specific instances to support [his] broad allegations"). In any event, Riley "makes no specific argument and cites no authority to support any of these claims, so we do not address them." *Sauder*, 318 Ga. at 816 (7) (f) n.21 (citing former Supreme Court Rule 22). See also current Supreme Court Rule 22 (1); *Howard*, 318 Ga. at 686 (2) n.2 ("Moreover, because [the appellant] makes no

substantive argument or citation of authority regarding trial counsel's alleged deficiencies in this regard, we would not address such claims of ineffectiveness even if they were contained in his enumerations of error." (citing former Supreme Court Rule 22)).

4. Riley also claims that his trial counsel was ineffective by failing to pursue severance of both the count of cruelty to children, which was alleged to have occurred on the same day as the murder, and the three counts of aggravated assault of Lisa that were alleged to have occurred on June 14, 2015, from the murder counts. Counsel did file a pre-trial motion to sever the aggravated assault counts that allegedly occurred on June 14, 2015 from the counts of murder and other crimes alleged to have occurred on July 9, 2015. But he withdrew the motion to sever based on the parties' agreement, which the trial court accepted, to sever the count of aggravated assault allegedly occurring on May 25, 2015. As explained above in footnote 1, the indictment included one count of aggravated assault of five persons that allegedly occurred on May 25, 2015, but, pursuant to the parties' agreement, that count was not presented to the jury and

in fact was nolle prossed after trial.[6]

The record shows that trial counsel's agreement not to pursue severance of the cruelty to children count and the June 14, 2015 aggravated assault counts from the murder counts benefitted Riley by securing the State's agreement to sever the count of aggravated assault of five persons on May 25. Riley's strategic choice to withdraw his motion to sever in return for the State's agreement to sever the May 25 aggravated assault was not objectively unreasonable, especially when it appears that the aggravated assaults against the victim less than a month before the murder and the crimes against the child at the same time as the murder would have been admissible even if they had not been charged in this

---

[6] Riley enumerates trial court error with respect to severance, and the enumeration itself does not mention the ineffectiveness claim, although he discusses this ineffectiveness claim in his argument under the enumeration. When counsel withdrew the motion to sever before the trial court ruled on it, he waived the issue of whether the trial court erred in not granting severance. See *Leonard v. State*, 316 Ga. 827, 836 (4) (889 SE2d 837) (2023) ("Because Leonard failed to obtain a ruling on the issue [of severance], he cannot raise it for the first time in this Court." (citation and punctuation omitted)); *Moss v. State*, 298 Ga. 613, 615 (3) (783 SE2d 652) (2016) ("Appellant withdrew his motion to quash at a motions hearing, before the trial court had ruled on it, so he cannot now complain that the court did not grant it."). And the issue may not be reviewed for plain error. See *Leonard*, 316 Ga. at 836 (4) n.9.

indictment. See *McNabb v. State*, 313 Ga. 701, 713 (2) (a) (872 SE2d 251) (2020) (holding that trial counsel did not perform deficiently by failing to object to certain evidence because his "strategic choice to pursue an agreement with the prosecutor after initially filing a motion in limine to exclude the evidence at issue . . . was not objectively unreasonable," where counsel "would have pressed his objections had he not obtained a favorable outcome with the prosecutor, and it was not unreasonable for trial counsel to believe he received a more favorable outcome in his negotiations with the prosecutor than he might have received by pressing his motion with the trial court, as much of the evidence [at issue] could have been admitted as intrinsic evidence of the crimes"); *Lowe v. State*, 314 Ga. 788, 791-794 (2) (a) (879 SE2d 492) (2022) (holding that the trial court did not abuse its discretion in denying a motion to sever murder charges from charges involving similar acts of domestic violence against the victim occurring two years before the murder, because such other-acts evidence would have been admissible to demonstrate the parties' prior difficulties, shed light on the

23

appellant's motive, and to counter his defense of accident); *Carson v. State*, 308 Ga. 761, 764 (2) (a) (843 SE2d 421) (2020) ("Severance is generally not warranted where the crimes charged [involved different victims but] occurred over the same period of time and stem from a course of continuing conduct." (citation and punctuation omitted)).

5. Finally, Riley contends that his trial counsel conceded guilt at trial and thereby created a structural error that must be presumed prejudicial under *McCoy v. Louisiana*, 584 U. S. 414 (138 SCt 1500, 200 LE2d 821) (2018). Specifically, Riley argues that counsel used a defense of insanity or mental defect that Riley had explicitly and vehemently rejected: that Riley, as a result of his participation in the sport of boxing, suffered from CTE, a progressive brain injury caused by multiple concussions, and that this injury caused him to commit the crimes. However, as explained below, to the extent that counsel argued such a defense, he did not concede guilt and therefore did not violate *McCoy*.

*McCoy* held that a defendant has the right under the Sixth

24

Amendment "to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty" and that "[w]ith individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense[.]" 584 U. S. at 417-418. The State relies on the fact that the death penalty was not sought in this case and on a suggestion in the dissenting opinion in *McCoy* that the Court's holding was "effectively confined to capital cases." Id. at 433 (II) (Alito, J., dissenting). But even assuming that *McCoy* is not limited to capital cases,[7] counsel did not disregard the defendant's prerogative as prohibited in *McCoy*.

As we recently explained, the United States Supreme Court specifically held in *McCoy*, 584 U. S. at 422-423 (II) (A), that "autonomy to decide that the objective of the defense is to assert

---

[7] We recently took the same tack in another case, where – like here – we assumed without deciding that *McCoy* could apply in non-capital cases. See *Griffin v. State*, Case No. S25A0086, 2025 WL 515896, at *3 (2) n.3 (decided Feb. 18, 2025).

25

innocence is reserved for the client," and "when a client expressly asserts that the objective of his defense is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *Griffin v. State*, Case No. S25A0086, 2025 WL 515896, at \*3 (2) (a) (decided Feb. 18, 2025) (punctuation omitted).Here, we conclude that Riley's claim fails because counsel did not "concede" guilt in the same manner as counsel in *McCoy*. See id. at 423 (II) (A) ("When a client expressly asserts that the objective of his defen[s]e is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (citation, punctuation, and emphasis omitted)). Cf. *Griffin*, 2025 WL 515896, at \*4 (2) (b) (assuming that counsel "conceded" the defendant's guilt but concluding that the record did not support the existence of an "intransigent and unambiguous objection").

In *McCoy*, counsel left no doubt that he was conceding the defendant's guilt, telling the jury that the evidence was "unambiguous," that the defendant "was the killer," and that on this

26

issue counsel "took the burden off of the prosecutor." Id. at 419-420 (I) (citation and punctuation omitted). See also *Christian v. Thomas*, 982 F3d 1215, 1222 (III) (B) (1) (9th Cir. 2020) (recognizing that "McCoy's counsel did not couch, equivocate, or preface these statements with assurances that he was arguing only in the alternative"). Unlike counsel in *McCoy*, Riley's trial counsel – during closing argument – repeatedly emphasized the prosecutor's burden to prove Riley's guilt beyond a reasonable doubt  and asserted the prosecutor's failure in this circumstantial evidence case to exclude the following reasonable theories other than guilt: that Lisa "committed suicide after he left"; that she "committed suicide while he was there before he left and he was afraid to report it"; that "if he did it, he did it without malice aforethought, which means that's voluntary manslaughter," a theory he called a reasonable "alternative" theory[8]; and finally that "[i]f he did it, he did it because of CTE, which is a disease, a brain damage disease, that boxers get"

---

[8] Riley raises no claim that counsel conceded guilt against Riley's wishes by arguing the alternative theory of manslaughter.

27

and that would result in a verdict of "not guilty by reason of insanity." Also during closing argument, counsel reviewed a variety of evidence that he argued supported the theory of suicide or manslaughter but that would not support the alternative theory based on CTE.[9]

Urging the jury to consider insanity based on CTE as an alternative argument did not amount to a concession of guilt, did not relieve the State of its burden to prove Riley's guilt beyond a reasonable doubt, and reflected an objective that was identical to Riley's: acquittal. Counsel's "objective was not, as it was in *McCoy*, to forsake acquittal in hopes of obtaining a lighter sentence." *Christian*, 982 F3d at 1225 (III) (B) (3). In short, counsel did not violate Riley's Sixth Amendment rights under *McCoy* simply by arguing an alternative theory to support acquittal, and therefore did not create a structural error that must be presumed prejudicial.

*Judgment affirmed. All the Justices concur.*

---

[9] These closing arguments were drawn in part from counsel's own cross-examination of the State's witnesses and were consistent with counsel's opening statement.