**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0001
Shanard Deshun Rease
v.
The State

On Appeal from the Superior Court of Fayette County
No. 2019R0241

Decided: June 16, 2026

LAND, Justice.

Appellant Shanard Rease was convicted of felony murder in relation to the strangulation death of his neighbor, Mimi Perry.[1] On appeal, Rease argues that the trial court erred by excluding alibi and rebuttal evidence, that the admission of a DNA expert's testimony and the State's mischaracterization of that ev-

---

[1] Perry was killed on May 24, 2019. On June 18, 2019, a Fayette County grand jury indicted Rease, charging him with malice murder (Count 1), felony murder (Count 2), and aggravated assault (Count 3).

At a trial from January 13 to 17, 2020, a jury found Rease guilty of Counts 2 and 3. The jury was unable to reach a unanimous verdict on Count 1. The trial court sentenced Rease to serve life in prison without the possibility of parole for Count 2. Count 1 was nolle prossed, and Count 3 merged into Count 2 for sentencing purposes.

Rease filed a timely motion for new trial on January 23, 2020, which was amended through new counsel on September 6, 2022. Following hearings on April 4 and October 3, 2023, the trial court denied the motion for new trial, as amended, on June 5, 2024. Rease timely filed a notice of appeal on June 24, 2024. This case was docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

idence are reversible errors, that the trial court's comments expressed an opinion as to Rease's guilt, and that his trial counsel rendered constitutionally ineffective assistance.[2] For the reasons that follow, we affirm.

1. The evidence presented at trial showed the following. Perry lived on the basement level of her townhome, which had its own door leading out to the back of the building, and her roommate lived upstairs. On May 24, 2019, "a little before 5[:00 p.m.]," Perry's roommate heard Perry's shower running, but she grew concerned when she did not hear Perry leave the house.[3] She went downstairs around 6:30 p.m. to check on Perry and found that Perry was gone but that the lights and TV in her room were still on. Sometime before 8:00 p.m., a neighbor told Perry's roommate that a body was discovered at the end of their building.

Officers were dispatched to the scene at 7:53 p.m. and found Perry "lying on the ground in a supine position" behind the apartment building, "naked with several … visible injuries." An officer testified that, based on Perry's "discoloration … it appeared that she had been there for a little while." A dress and hairpiece were found just feet away from Perry's body. The door leading from Perry's room to the backyard was "cracked," and a search of Perry's room revealed a damp towel in the hamper and a hair straightener that was still plugged into the wall and turned on.

Perry's autopsy revealed abrasions and bruises throughout

---

[2] In various places throughout Rease's brief, he fails to recite the correct standard of review for his claims. We recount his arguments as he does but then apply the correct standard of review to each.

[3] Perry had plans to attend a high school graduation that evening at 7:00 p.m., and Perry's roommate testified that she "knew that … Perry never wanted to be late for anything."

her body; several "blunt impact injuries" to her head; and multiple signs of strangulation, including petechiae of the face,[4] significant bleeding in the neck, partially broken thyroid cartilage, and a broken hyoid bone. The medical examiner who performed Perry's autopsy concluded that Perry died of "multiple traumatic injuries," including "impacts to her head [and] impacts to parts of her body, including her face" as well as "manual strangulation."

As part of their investigation, law enforcement spoke to Rease, who was Perry's neighbor, twice. Rease was later identified as a suspect after investigators discovered that he was on probation for the aggravated assault of a former female neighbor. He agreed to go to the police station to talk with investigators.

During his interview, Rease claimed that a couple of days prior, he had helped Perry move a large planter from her back porch to her room. When asked about his whereabouts around the time of the murder, Rease claimed that he was at home most of the day but walked across the street to a gas station to buy cigarettes shortly after 4:00 p.m. Rease also said that his mother, Anita Ingram – who lived with him – stopped by the grocery store after work and got home "a little after five" that evening. When investigators inquired about some "relatively fresh" "marks, scratches, cuts, that were in … a crescent shape on [Rease's] arm and forearm," Rease said that he had been injured at work earlier that day and had reported the injury to his supervisor.

At trial, Rease's supervisor testified that Rease had not reported any injuries on the day of the murder. Moreover, an officer testified that he had reviewed the surveillance footage from the gas station that day – specifically, between 4:00 and 6:00 p.m. –

---

[4] The medical examiner testified at trial that this occurs when "small blood vessels in the area burst under pressure."

and did not see Rease on the footage. And Ingram testified that, when she arrived home from the grocery store around 6:00 p.m., Rease was present, and they did not leave the house after that.

The State also presented testimony from a DNA expert who had completed DNA tests on Perry's fingernails. The expert testified that there was "about a 50/50 mixture" of two DNA profiles under Perry's right-hand fingernails.[5] He testified that there "would have to be a lot of DNA on the surface that [Perry] was scratching" to result in that amount of DNA under her nails. The expert removed Perry's known DNA profile from the mixture, leaving the remaining DNA as the "foreign profile," and this foreign profile matched Rease's DNA.[6]

During closing argument, Rease's trial counsel contended that Rease's DNA was transferred to the planter when he moved it for Perry and that Perry must have touched it later, which would explain the presence of his DNA beneath her nails. Rease's counsel also raised an alibi defense, arguing that Perry was known to be showering around 5:30 p.m.,[7] and that Ingram was home with Rease between 6:00 and 8:00 p.m.

2. Rease argues that the trial court erred by excluding alibi and rebuttal evidence. Specifically, he contends that the trial court's exclusion of two receipts and a GPS map was improper. Because any abuse of discretion in excluding this evidence was

---

[5] The DNA under Perry's left-hand fingernails reflected "at least a second individual," but the DNA expert testified that, because the DNA amount was so little, there was "limited data" for the additional DNA.

[6] Investigators had collected voluntary DNA samples from Perry's roommate, ex-husband, ex-husband's fiancée, and boyfriend. After obtaining a search warrant, they also collected DNA from Rease.

[7] The testimony provided by Perry's roommate, however, was that she heard the shower running around 5:00 p.m.

4

harmless, this claim fails.

(a) Prior to trial, Rease filed a "Notice of Alibi Defense" in accordance with OCGA § 17-16-5(a),[8] explaining that "Ingram will testify that Mr. Rease was in their shared residence from approximately 5:55 p.m. when she came home after work and after grocery shopping until shortly after 8:00 p.m. when law enforcement arrived following the discovery of [Perry]'s body."

On the second day of trial, Rease's counsel provided the prosecution with a bank receipt,[9] a grocery store receipt,[10] and a GPS map from a "driving app" showing Rease's driving history between 3:17 a.m. and 2:58 p.m. on the day of Perry's murder. The prosecutor alerted the trial court that he was "just served" with this evidence and that Rease had failed to provide any of these documents before trial. The prosecutor contended the defense had acted in bad faith and sought to exclude the items from evidence.

---

[8] OCGA § 17-16-5(a) provides:
Upon written demand by the prosecuting attorney within ten days after arraignment, or at such time as the court permits, stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days of the demand of the prosecuting attorney or ten days prior to trial, whichever is later, or as otherwise ordered by the court, upon the prosecuting attorney a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names, addresses, dates of birth, and telephone numbers of the witnesses, if known to the defendant, upon whom the defendant intends to rely to establish such alibi unless previously supplied.

[9] The bank receipt documented a check deposit at 9:54 a.m. on the day of the murder.

[10] The grocery store receipt documented a purchase at 5:39 p.m. on the day of the murder.

When asked if the items would be used "in support of the alibi defense," Rease's counsel responded, "No," but that the driving map would be "in support of rebuttal" if the State challenged Rease's statement about going to the gas station.

Rease's counsel conceded that Ingram had been in possession of Rease's cell phone since the day of Perry's death, but counsel asserted that he did not obtain the phone from her until just prior to trial. And he admitted that he had amended a witness list on the first day of trial to include an investigator who would testify about the GPS map but did not provide the prosecution with a copy of that map at that time. The trial court also pointed out that Rease's counsel had been in possession of the receipts for at least six days prior to disclosing their existence to the State. Rease's counsel explained that there were "[j]ust too many pieces on the chessboard" and that "[w]e don't have the resources to do all these things."

The court noted that Rease's counsel could have attached the receipts to the alibi notice, which referenced Ingram's anticipated testimony, when the notice was filed shortly before trial. And as for the GPS map, the trial court explained that it was disinclined to require the State to "do some kind of [rushed] analysis of [Rease's] phone" and concluded that the State would be deprived of a fair opportunity to rebut the evidence. The court also determined that, whether or not there had been a discovery violation, unless the cell phone was admitted, the GPS map was inadmissible under the best evidence rule. See OCGA § 24-10-1002 ("To prove the contents of a writing, recording, or photograph, the original writing, recording, or photograph shall be required."). Ultimately, the court ruled that "the [grocery store] receipt, the bank receipt, and the GPS record, are excluded from evidence. And no witness shall mention any of those three documents."

(b) "A trial court's decision whether to admit or exclude evidence is reviewed on appeal for an abuse of discretion." *Tarver v. State*, 319 Ga. 165, 169 (2024) (citation and punctuation omitted). "[W]e will reverse a conviction based on a trial court's abuse of discretion in excluding evidence only if the exclusion was harmful." *Mbungu v. State*, 322 Ga. 564, 567 (2025). To determine whether a nonconstitutional error was harmful, we ask "whether it is highly probable that the error did not contribute to the verdict." Id. (citation and punctuation omitted).

Assuming without deciding that the trial court abused its discretion by excluding the GPS map and receipts at trial, we conclude that any such error was harmless. The GPS map merely shows Rease's driving history between 3:17 a.m. and 2:58 p.m. on the day of Perry's murder and indicates that he arrived home at 2:58 p.m. and did not drive anywhere else. This places him near the scene at least two hours prior to Perry's death. And to the extent it shows that he traveled to the gas station, he did so prior to 3:00 p.m. Therefore, any contention from the State that Rease did not visit the gas station when he claimed to – shortly after 4:00 p.m. – would not have been rebutted by this evidence. The map, therefore, does not support either an alibi or rebuttal defense, despite Rease's arguments to the contrary.

As for the receipt evidence, the bank receipt placed Ingram at the bank prior to work on the day of the murder, but she was not asked at trial about her whereabouts that morning and did not testify to such. Moreover, the grocery store receipt only corroborated Ingram's uncontradicted testimony that she picked up groceries after work and arrived home around 6:00 p.m. Rease's presence at the apartment when Ingram got home does not provide him with an alibi defense because this evidence shows that Ingram was not home with Rease between 5:00 and 6:00 p.m., and

7

the State's theory of the case was that Perry was murdered in that window of time.

And though the other evidence of Rease's guilt may not be overwhelming, the evidence against him was strong. In particular, Rease was near Perry's apartment during the window of time that she was murdered, there was an unusually large quantity of his DNA under Perry's fingernails, and there were unexplained defensive wounds on his arms on the day of the murder.

Thus, it is highly probable that the exclusion of this evidence, even if it was the product of error, did not contribute to the verdict, and this claim fails. See *Palmer v. State*, 310 Ga. 668, 676–78 (2021) (where date and time of victim's death was unknown, potential alibi witness offered only vague details of defendant's whereabouts, and the other evidence of the defendant's guilt was strong, any error in excluding the witness's testimony was harmless); *Graves v. State*, 303 Ga. 305, 308–09 (2018) (any error in exclusion of alibi evidence was harmless where the evidence of the defendant's guilt was overwhelming and "the alibi testimony was of limited probative value, because it specified no time at which [the defendant] was at his mother's house, and a witness presented by the State testified that [the defendant] was indeed at his mother's house that night, after the time of the murders" (footnote omitted)); *De La Cruz v. State*, 303 Ga. 24, 27 (2018) (exclusion of alibi evidence was harmless where alibi witness was only with defendant until midnight, evidence showed that victim was murdered between 4:00 a.m. and 5:00 a.m., and the excluded evidence would have been cumulative of other testimony).

3. Rease argues that the testimony provided by the State's DNA expert and the State's mischaracterization of that evidence are reversible errors necessitating a new trial. Specifically, Rease

challenges certain statements made by the prosecutor during the State's opening and closing statements as well as testimony from the State's DNA expert. We reject Rease's contentions.

During the State's opening statement, the prosecutor stated that

> the DNA matched. … But what's the frequency of the DNA profile that Mr. Rease has? How many people have the same kind of DNA profile that he has? DNA can match with different kinds of frequency. … What's the frequency of the kind of DNA Shanard Rease has with anybody else? This is a number called one hundred septillion. This is the frequency, or I think a better way of putting it would be the lack of frequency, of Shanard Rease's DNA with that of everybody else. … And really it's more than everybody else, because you may know there are not this many people on the earth. That's how infrequent it is. That's how particular it is. That's how it is close to being said that it is his and his alone.

On direct examination, the State's DNA expert, who performed the DNA analysis on Perry's fingernails, confirmed that "there was a DNA match between one of the contributors in [the] right-hand fingernail swabbing" and Rease. He further testified that he calculated a statistic "based off the [foreign] evidence profile" to represent how often he would expect to see that profile in the entire population and concluded that the "frequency of the foreign DNA profile in a given population would be expected to occur one in one hundred septillion."[11] The expert explained that

---

[11] He clarified that the frequency he generated was "not the frequency

9

he "would have to test an additional hundred septillion individuals before [he] would see that DNA profile occur again," so he "would not expect to see this DNA profile again in the world's population."

During closing argument, the prosecutor again referenced the DNA evidence as follows:

> After all the lies, and we can make a list of them, all of the lies, all the contradictions, all the new stories … this is what these folks base their defense on. This is what these folks need you to believe to ignore this DNA evidence of one and one hundred septillion. And you know, I got some of that wrong, but the DNA scientist set me right about, and you should have that in your notes. After all of that, after all of these lies, these folks want you to base your belief that the DNA under her right-hand fingernails came from this pot and that he helped her move the pot.

To start, Rease's challenges regarding the prosecutor's comments on the statistical significance of the DNA evidence during the State's opening and closing statements are waived on appeal. Because these statements are not considered evidence and Rease made no objection to the remarks at trial, the issue is waived and plain error review does not apply. See *Huff v. State*, 315 Ga. 558, 564 (2023) ("[O]pening statements are not considered evidence, and failure to timely object to a remark in opening

---

of Shanard Rease" but was "based off the evidence profile itself" from the sample gathered from Perry's fingernails. Moreover, he confirmed that the statistic was not "an estimate of how frequent or infrequent [Rease's] DNA profile would be in the general population," but rather showed "how frequent or infrequent the foreign profile [he] generated from the evidence is seen in the population."

statements waives the issue on appeal."). See also *Callaway v. State*, 321 Ga. 186, 193 (2025) (claim that prosecutor's closing argument was improper was "waived because [the defendant] did not object to the closing argument at trial … and claims that improper statements were made in closing argument are not subject to review for plain error"). Accordingly, these claims of error concerning the prosecutor's comments fail.

As for Rease's argument regarding the expert's trial testimony, Rease argues that the expert mistakenly indicated that the frequency he calculated was based on Rease's DNA rather than on the foreign profile collected from Perry's fingernails. Because Rease did not object to this testimony at trial, we review this claim for plain error only. See *Samuels v. State*, 323 Ga. 629, 638 (2026). To establish plain error, Rease "must point to a legal error that was not affirmatively waived, was clear and obvious beyond reasonable dispute, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Carter v. State*, 317 Ga. 689, 693 (2023) (citation and punctuation omitted). "We need not analyze all of the elements of this test when, as in this case, the defendant has failed to establish one of them." Id. (citation and punctuation omitted).

Rease does not demonstrate any error or defect, much less an obvious one, in the expert's testimony, so his claim fails. The expert permissibly testified that the large amount of foreign DNA under Perry's right fingernails was unusual, that the foreign DNA profile generated was a match for Rease's DNA, and that there was an extremely low statistical probability of finding this foreign profile again in the entire population. And the expert clearly articulated that his statistic was not generated from Rease's DNA profile, specifically, but was generated from the foreign profile found under Perry's nails. See *Nundra v. State*, 316

Ga. 1, 14 (2023) (trial court did not plainly err in admitting testimony showing that it was "two billion times more likely" that the DNA from the evidence matched the defendant than a random individual). Accordingly, the expert's testimony was not improper, and the trial court did not commit any error, let alone plain error, by allowing it at trial.

4. Rease argues that certain comments the trial court made expressed an opinion as to Rease's guilt. We are not persuaded.

(a) The jury began deliberations at 2:07 p.m. on January 16, 2020, and the trial judge proposed that the jury deliberate until 5:00 p.m. The jury re-entered the courtroom at 4:43 p.m., at which time the trial judge commented on the schedule for further deliberation. Because the next day was Friday and the following Monday was a holiday, the trial judge inquired as to what the jurors thought would be "most availing and productive for the scheduling of [their] further deliberations[.]"The trial judge also made them aware that he had to attend an out-of-town conference the following week, but that he would return if they had any questions or reached a verdict while he was away. Prior to excusing the jurors to resume their deliberations, the trial judge asked them to "guide [the court] in whether [they] want[ed] to stay into the evening or not. And if not, what time [they] wish[ed] to resume in the morning, being mindful … of the scheduling matter next week." The jury continued deliberations until 6:20 p.m. that evening and resumed deliberations the next morning. At 12:10 p.m., they sent a note to the court: "We are unable to come to a unanimous decision on one of the counts, and it seems unlikely that we will be able to." The court marked the note as an exhibit, and the following bench conference took place:

COURT: And response from the State?

12

STATE: I would just urge the [c]ourt to make -- obviously to clarify with the jury that they've reached a verdict on -- that that means that they've reached a verdict on two of the counts.

COURT: Right.

STATE: And then -- and then urge the [c]ourt to receive the jury's verdict.

COURT: Okay. And what do you say?

DEFENSE: Yes, sir. That would be fine. Thank you.

After the jury returned to the courtroom, the foreperson confirmed the situation described in the note, and the following discussion ensued:

COURT: [Y]ou're seeking direction as to that situation?

FOREPERSON: Right. I mean, our jury form allows us to do unanimous verdicts only. So if that's not looking possible, what do we do?

COURT: Right. The answer after conferring with counsel is to reach unanimous verdict if you can on the two counts as to which you've told me you've reached unanimous verdict. I'm not directing that you reach a unanimous verdict. I'm just stating that if you have reached unanimous verdict on two counts, so mark the jury verdict form and leave the count as to which you have not reached unanimous verdict blank. Sign the jury verdict form, date it, ad-

vise the bailiffs that you've reached unanimous verdict as to two counts, if that is true, and if indeed you have reached unanimous verdict. … And notify the bailiff and we'll return you back here and receive the verdict as to those unanimous counts. … Nothing the [c]ourt is saying here is mandating, directing, or either suggesting that you reach unanimous verdict on any count, much less the two counts, whatever they are, that you -- whichever they are that you've mentioned to me in this question and in our discussion that you've reached.

The jury exited at 12:18 p.m. and returned at 12:31 p.m. with a verdict form that left Count 1 blank but found Rease guilty on Counts 2 and 3.

(b) Because Rease did not object to the court's statements during trial, we again review this claim for plain error. See *Sturkey v. State*, 319 Ga. 156, 158–59 (2024). Pursuant to OCGA § 17-8-57(a)(1), "[i]t is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused." The statute is "violated only when a trial court's instruction, considered as a whole, assumes certain things as facts and intimates to the jury what the judge believes the evidence to be." *Smart v. State*, 299 Ga. 414, 423 (2016) (cleaned up).

Here, neither the court's comments about its schedule for continuing deliberations nor its statements regarding the jury's inability to reach a verdict on all of the counts of the indictment were improper. The court's scheduling discussion did not imply that the jury needed to reach a verdict – much less any particular verdict – quickly. Rather, the court laid out potential timelines

14

for the jurors to continue their deliberations. And at no point did the court provide any commentary that suggested Rease's guilt or intimated to the jury what the judge believed the evidence to be, and Rease points us to none.

Rease argues that "the trial court receipt of communications from the foreperson and contemporaneous oral responses thereto were improper and contrary to law," citing *Lowery v. State*, 282 Ga. 68, 76 (2007).[12] But the record reflects that the court followed the proper procedure for handling the jury's note about their inability to reach "a unanimous decision on one of the counts." See *Suggs v. State*, 310 Ga. 762 (2021) (holding that the trial court complied with *Lowery* where the court received a jury note, marked it as an exhibit in the presence of counsel and discussed the note and intended response with counsel before bringing in the jury). And from this note, the court inferred – during a bench conference – only that the jury had likely reached unanimous verdicts on the other two counts and discussed the proper response with the parties. Neither party objected.

Upon the jury's return to the courtroom, the court explained to the jurors how they should handle a partial verdict, "if that is true," but reminded them that "[n]othing the [c]ourt is saying here is mandating, directing, or either suggesting that you reach unanimous verdict on any count." See *Ingram v. State*, 290 Ga. 500, 504 (2012) (where, after receiving an inconsistent verdict, the trial court "specifically admonished the jurors that they

_____

[12] In *Lowery*, 282 Ga. at 76, we instructed that trial courts are required to have jurors' communications submitted to the court in writing; to mark the written communication as a court exhibit in the presence of counsel; to afford counsel a full opportunity to suggest an appropriate response; and to make counsel aware of the substance of the trial court's intended response in order that counsel may seek whatever modifications counsel deems appropriate before the jury is exposed to the instruction. That is what the trial court did here.

were authorized to find appellant guilty of the lesser or the greater offense and that the court was not in any way, shape, or form telling them how the verdict should read," the court's comments "were limited to a clarification of procedures" and did not constitute a basis for reversal (cleaned up)). Rease also argues that the "return of the verdict so quickly" following the court's comments implies that "the trial court's instructions and suggestions had an undesirable and prejudicial effect on Rease's guilt and jury deliberations." But, given the jurors' implication that they had already reached unanimous verdicts on two of the counts and would not likely be able to reach such a verdict on the third count, it is not surprising that it did not take them long to return to the jury room and re-cast their votes on those two counts pursuant to the court's instructions.

Because none of the court's remarks or responses to the jury's note expressed any opinion as to Rease's guilt (or that the jury was required to reach a unanimous verdict on any count), Rease has failed to show error, let alone plain error. See *Sturkey*, 319 Ga. at 159 (identifying no error, plain or otherwise, where judge's questions to a witness did not "indicate, either impliedly or expressly," that the judge viewed the evidence as conclusive of the defendant's guilt); *Smart*, 299 Ga. at 423 (identifying no plain error where the record was clear that "the judge was not commenting on the evidence but, instead was merely explaining the nature of the case" to potential jurors, which "in no way constituted the type of direct comment on the substance or weight of the evidence that we have held to violate OCGA § 17-8-57").

5. Rease argues that trial counsel provided constitutionally ineffective assistance through deficient preparation and performance. These claims fail.

To establish a claim of ineffective assistance of counsel, a

defendant must prove both deficient performance by his counsel and resulting prejudice. See *Strickland v. Washington*, 466 US 668, 687 (1984). To prove deficient performance, a defendant must show that his attorney performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687–88. The law recognizes a "strong presumption" that counsel performed reasonably, which the defendant bears the burden of overcoming. Id. at 689. And "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Wells v. State*, 295 Ga. 161, 164 (2014) (citation omitted).

Even when a defendant has shown that his counsel's performance was constitutionally deficient, the defendant also must prove resulting prejudice to prevail on a claim of ineffective assistance of counsel. To do so, the defendant must establish that but for his counsel's unprofessional errors, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Strickland*, 466 US at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 US 86, 104 (2011) (quoting *Strickland*, 466 US at 693). Rather, the defendant must demonstrate a "reasonable probability" of a different result, which is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. "If either *Strickland* prong is not met, this Court need not examine the other prong." *Palmer v. State*, 303 Ga. 810, 816 (2018). In all, the burden of proving a claim of ineffective assistance of counsel is a heavy one. See *Harrington*, 562 US at 105.

(a) Rease asserts 17 instances of ineffective assistance but

has listed the majority of these claims "in a cursory manner." *Riley v. State*, 321 Ga. 112, 120–21 (2025) (rejecting appellant's "list of generalized assertions of his trial counsel's alleged failings" because it did not "show in what respect his counsel's performance was deficient" (cleaned up)). Because Rease has not provided any meaningful argument or citations to authority or to the record for most of these claims, he has failed to meet his heavy burden of proving that trial counsel's alleged failures amounted to ineffective assistance. See id. at 120–21 (collecting cases). The claims not specifically addressed below are rejected for this reason. As for the ineffective assistance claims supported by at least limited substantive argument, we address – and reject – each in turn.

(b) Rease first argues that his counsel rendered ineffective assistance when he failed to highlight the weaknesses of the State's evidence – such as the State's overreliance on DNA evidence, lack of eyewitnesses, and the responding officer's failure to notice any injuries to Rease's body – in closing. But we cannot say that it was objectively unreasonable, and therefore deficient, for trial counsel to focus his argument on Rease's statements to law enforcement that supported his theory of defense, rather than focusing on the potential weaknesses in other pieces of the State's evidence.

"With respect to closing argument, defense counsel is permitted wide latitude and is not ineffective simply because another attorney might have used different language or placed a different emphasis on the evidence." *Anthony v. State*, 311 Ga. 293, 298 (2021) (cleaned up). In closing, counsel emphasized his theory that Rease's DNA was found under Perry's fingernails because he recently helped her move a planter. Counsel also downplayed the significance of the DNA evidence itself by criticizing the State's failure to conduct additional testing on the DNA evidence from

18

Perry's left fingernails and neck, which he contended would have established the identity of the murderer. See *Padgett v. State*, 322 Ga. 121, 123–24 (2025) (concluding that there was no deficiency where counsel, in closing, strategically attempted to downplay incriminating DNA evidence – noting that the DNA could have been deposited when the victim and defendant "tussle[d]" two days before the victim's body was found – and instead emphasized the DNA evidence found on other tested items which could not be attributed to the defendant). Moreover, counsel argued the circumstantial nature of the case by focusing the jury's attention on the State's burden of proof, the "significant deficits" in the evidence, and the "flaws" in the State's case.

At the motion for new trial hearing, counsel testified that his "strategic position was to explain the reason that there might have been DNA produced by Mr. Rease on fingernails … that were taken from [Perry]. And it was our strategy to show that DNA could be transferred in other ways from what was alleged by the State[.]"

Counsel's strategic decisions about what to highlight and what to downplay during his closing argument were not so patently unreasonable that no competent attorney would have followed such a course. Rease, therefore, has not shown that his counsel's performance was deficient. See *Padgett*, 322 Ga. at 124 ("Under these circumstances, trial counsel's decision not to emphasize the DNA evidence … was objectively reasonable.").

(c) Rease next argues that his counsel provided ineffective assistance for failing to serve timely discovery of the GPS map and receipts to the State. But even assuming that trial counsel's failure to provide the State with this evidence was deficient, Rease has not shown that he was prejudiced by such failure.

As explained in Division 1, the GPS map merely reflected

19

Rease's whereabouts at least two hours prior to the murder, and the receipts only corroborated Ingram's uncontradicted testimony. This evidence does not provide Rease with an alibi defense placing him at a location other than the scene of the crime at the time of its commission or otherwise exclude the possibility of his guilt. Rease, therefore, has not demonstrated that the outcome of his trial would likely have been different had counsel provided timely notice of this evidence and had it been introduced at trial. See *Tarpley v. State*, 298 Ga. 442, 447–48 (2016) (though trial counsel failed to ensure that certain evidence was produced to the State or adduced at trial, the evidence was "merely cumulative of other witnesses' descriptions … and [the defendant's] own testimony," so the defendant showed no prejudice).

(d) Rease also argues that his counsel was ineffective for his failure to object to the State's "comment on [Rease's] silence" during closing. Specifically, the prosecutor posited to the jury: "[E]ven though there may be some pieces missing, there may be some things unknown, or … known only to [Rease] who declined to tell th[e] police officer about them. … [D]on't you still know what you're seeing?"

Rease fails to cite any legal authority to support his assertion that the prosecutor's comments were improper. Nevertheless, trial counsel's decision not to object to these remarks was objectively reasonable. Prosecutors are afforded "wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion." *Menefee v. State*, 301 Ga. 505, 510–11 (2017) (cleaned up). Moreover, they are "allowed to argue inferences that may reasonably be made from the evidence presented at trial." Id. at 515.

The prosecutor's statement here can reasonably be understood as a reference to the holes in the stories that Rease told law

enforcement over the course of his conversations with them. Since it is not improper for the State to comment on key details left out of a defendant's pre-trial statements to police, such a remark is materially different than a comment on a defendant's refusal to talk at all. See e.g., *Fadesire v. State*, ___ Ga. ___, S26A0174, slip op. at 2–3 (Ga. Mar. 17, 2026) (2026 WL 739095) (while prosecutor's comment during closing "may have been an oblique reference to the right to remain silent," it was not improper where he "did not refer specifically to [the defendant's] decision not to testify" and the statement was made to "address[ ] a weakness in the State's case").

Because the comment was not "obviously" improper, a reasonable lawyer in Rease's counsel's place could have determined that an objection to the prosecutor's statement "would have been meritless" or "might have called more attention to [the defendant]'s silence than the remark itself." See *Fadesire*, S26A0174, slip op. at 3 (Ga. Mar. 17, 2026) (2026 WL 739095). Rease has, therefore, failed to show that his counsel was deficient in this respect.

(e) Rease baldly asserts that the State "repeatedly accused Rease of creating lies and stated his personal belief of the veracity of the witnesses and evidence submitted." But Rease fails to identify a single instance in the record to support his broad allegation. See *Henderson v. State*, 304 Ga. 733, 739 (2018) ("It is not this Court's job to cull the record on behalf of [the defendant] to find alleged errors." (cleaned up)). Rease has not indicated with any specificity what his counsel should have objected to or how he was prejudiced by counsel's supposed failure to object to these unidentified comments. See *Sauder v. State*, 318 Ga. 791, 816 n.21 (2024) ("To the extent [the defendant] has not identified specific instances of these alleged deficiencies, he has not carried his burden

of showing that his lawyer performed deficiently.”). His claim of ineffective assistance, therefore, fails.

6. To the extent Rease contends that the cumulative effect of errors at his trial requires reversal of his convictions, this claim also fails. Under *State v. Lane*, 308 Ga. 10, 17 (2020), we must “consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel.” To establish cumulative error, a defendant must show that “at least two errors were committed in the course of the trial” and that “the multiple errors so infected the jury’s deliberation that they denied the [defendant] a fundamentally fair trial.” Id. at 21 (citation and punctuation omitted).

Because we assumed error in Division 1 relating to the trial court’s exclusion of the GPS map and receipts and assumed deficiency in Division 5(c) relating to trial counsel’s failure to timely serve the State with this evidence, we now consider whether the cumulative prejudicial impact of these errors requires a new trial. We concluded above that the trial court’s alleged error and counsel’s presumed deficiency did not contribute to the verdict and that there was no reasonable probability that the result of Rease’s trial would have been different in the absence of the presumed errors. Even considering the combined effect of these presumed errors, we see no basis for reversal. Rease, therefore, has failed to establish that he was denied a fundamentally fair trial. See *Dickerson v. State*, 323 Ga. 389, 402 (2026) (“Though we assumed without deciding the presence of several errors in the course of [the defendant’s] trial, they each produced very little, if any, harm, as explained in the respective divisions above.”); *Jackson v. State*, 317 Ga. 95, 106–07 (2023) (considering several assumed errors and finding no cumulative prejudicial impact that would

22

require a new trial).[13]

*Judgment affirmed. All the Justices concur.*

---

[13] In three of the enumerations of error in Rease's brief – addressed in Divisions 2, 3, and 5 above – Rease asks this Court to grant him a new trial "in accordance with" OCGA §§ 5-5-20 and 5-5-21. "Whether to grant a new trial on the general grounds [OCGA §§ 5-5-20 and 5-5-21] is a decision left to the sole discretion of the trial court." See *Gines v. State*, ___ Ga. ___ (2026), S25A1305, S25A1306, S25A1307, slip op. at 34–35 (Ga. Mar. 12, 2026). Rease does not argue that the trial court failed to exercise its discretion under the general grounds, and we lack the authority to substitute our discretion for that of the trial court.